[No. H025966. Sixth Dist. May 9, 2005.]

JOSEPH A. LIBRERS, Plaintiff and Appellant, v.
MARIA E. BLACK, Defendant and Respondent.

COUNSEL

Stephen W. Penn for Plaintiff and Appellant.

Patrick E. Standifer for Defendant and Respondent.

OPINION

**McADAMS, J.**—Family Code section 7611, subdivision (d)[1] defines a "presumed father" as a man who "receives the child into his home and openly holds out the child as his natural child." The question in this appeal is whether the trial court erred in finding that appellant lacked standing to prosecute an action under the Uniform Parentage Act (UPA) (§ 7600 et seq.) as a "presumed father." We hold that the trial court erred and, accordingly, reverse the judgment of dismissal and remand to the trial court for further proceedings in accordance with the views expressed in this opinion.

### FACTUAL AND PROCEDURAL SUMMARY[2]

Certain facts are undisputed. The child, N., was born in March 2001, to Maria. Joseph A. Librers and Maria E. Black lived together for a year before N.'s birth. At the time of N.'s birth, Joseph signed a voluntary declaration of paternity "to qualify N. for health insurance and other benefits." N. shares

---

[1] Unless otherwise indicated, all statutory references are to the Family Code.

[2] We take the facts from the pleadings, declarations and testimony given below.

Joseph's surname. N. at all times lived in Joseph's household for the 22 months of her life, until Joseph and Maria separated in January 2003.

Joseph was employed until October 2001, when N. was six months old, at which time Joseph became disabled by cystic fibrosis and could no longer work. After that, he was at home full time. When N. was born, Maria had no means to support herself and N. Her last day of employment was in May of 2001. Prior to that, she had been employed for approximately two years. Both parties acknowledge that at some point shortly before they stopped living together, Joseph, who had been drinking, dismantled a locked door to gain entry to a room in which N. and Maria were situated. After leaving Joseph's house with N., Maria once again found herself without the means of supporting herself and N., except for family support she received from her father in Florida.

Joseph is not N.'s biological father, and both Joseph and Maria had strong reason to suspect that he was not her biological father during Maria's pregnancy.[3] Joseph and Maria were never married and, in fact, at the time of the breakup, she was still married to David B. although, according to Maria, N.'s true biological father is Robert D. Neither David B. nor Robert D. has come forward to claim paternity of N.

At this point, the narratives begin to diverge. According to Joseph, "from the day N[.] was born, [he has] been an active, participating parent" and despite his illness, he has been "able to manage any and all of N[.]'s requirements. [He] regularly cooked, fed, bought clothing and cared for N[.] as any parent would do." According to Maria, "[d]uring the period [Joseph and she] lived together with N[.], [she] was solely responsible for [N.'s] daily care and needs including but not limited to feeding, bathing, sleep routine and medical care and supervision. The child was never left in [Joseph's] care except for a few occasions for very short periods when [Maria] would go to the store for food or household supplies or run a short errand."

Maria claims that Joseph told her to "vacate the residence" on January 1, 2003, and that she did so, with N., on January 25. Joseph claims that he was briefly hospitalized after an automobile accident, and when he returned he found that Maria had apparently been served with his "petition to establish paternity [and] left [his] house," taking N. with her, and refusing to allow him any contact with N. except under supervised conditions.

On January 17, 2003, Joseph filed petitions under the Uniform Child Custody Jurisdiction and Enforcement Act (§ 3400 et seq.) and the UPA

---

[3] According to Maria, when she was pregnant, Joseph's doctor told the two of them that Joseph was sterile due to his illness.

(§ 7600 et seq.) for establishment of a parental relationship and for joint legal and physical custody and reasonable visitation. He also requested "mediation to work out a parenting plan." Maria was served on January 22, 2003.

On January 29, 2003, Maria applied to the court ex parte for orders for custody, genetic testing pursuant to section 7575 to determine N.'s parentage,[4] and permission to relocate with N. to Florida. Joseph stipulated to genetic testing but otherwise opposed Maria's requests for permission to relocate, alleging under penalty of perjury that "I am clearly the presumed father at present because I have both signed a parternity [sic] declaration and held N[.] out as my child for the past two years. I have actively parented N[.] and she is very attached to me and I to her. There is no basis for an early order permitting N[.] to relocate to Florida and no reason why we should not participate in the normal mediation-JCC process." Joseph also filed his own request for an emergency screening due to Maria's refusal to let him have contact with N., except under supervised conditions.

In response to Joseph's petition to establish parentage, Maria specifically disputed that Joseph was N.'s biological father.

On January 31, 2003, the court granted Maria's request for genetic testing, ordered the parties to mediation and calendared a hearing for February 25, 2003. Following his review of the genetic testing which excluded him as N.'s biological father, Joseph renewed his request for emergency screening, averring that "N[.] has lived in my house for her entire life [and] I signed a declaration of paternity at the hospital. . . . [N]o other person [] has stepped forward to assume responsibilities for N[.]'s parenting and it is my under-standing that under recent case law this should be considered the critical factor by the court rather than biological test results."

On February 25, 2003, the court held a hearing at which Joseph, Maria, and Eric Towle, the court investigator, were sworn. The court "wanted to hear from [Mr. Towle] about how the court should proceed at this time" given that

---

[4] Although Maria's counsel stated at the February 25, 2003 hearing that Maria had timely filed a motion to set aside the voluntary declaration of paternity, there is no evidence in the record as to the disposition of that motion. Under section 7575, to be effective a rescission form must be filed with "the Department of Child Support Services within 60 days of the date of execution of the declaration by the attesting father or attesting mother, whichever signature is later, unless a court order for custody, visitation, or child support has been entered in an action in which the signatory seeking to rescind was a party." There is no evidence in the record that such a form was ever filed, nor were such orders excusing compliance with that requirement ever entered in this case. Nor is there any evidence that the court actually rescinded the declaration, although the statutory language suggests that an order setting aside the voluntary declaration of paternity must precede the order for genetic testing, which was ordered here.

Joseph "was going to be excluded at least by D.N.A. test to be the biological father" and that "there may be some psychological attachment that the court needed to be concerned about with regard to visitation and move away . . . ." Towle testified as to his "preliminary assessment." He had separately interviewed Joseph, Joseph's parents, Maria, and Maria's mother and had observed Joseph with N. in the playroom for some undisclosed period of time. Mr. Towle explained: "It's difficult from the information that I have so far to really make any kind of absolute assertion as to the quality of the bond between the child and the father. The child did not respond to the father in the playroom and did not show that there was a very strong bond. But that can also be explained by the fact that the child has been separated from the father for a month. And so that disruption could cause something of a change in the display of affection for the father. If . . . there was a very strong bond between the child and the father, if the father was a regular caretaker that disruption probably would not have been as absolute. So I can say that the bond between the father and the child is not probably on the very strong end of the spectrum but from that evidence I can't conclude that there isn't a bond at all." In fact, when asked to rate the bond from one to 10, Mr. Towle responded that it could be a three or it could be a seven; he didn't know. He opined that N. had not suffered "in an extreme way" from being away from Joseph but "there might be some more subtle process going on."

Although Mr. Towle noted disagreements between Joseph and Maria about the extent of their relative participation in childcare tasks, both sides agreed that Joseph was in the residence for two years and did take part in the child's life to some degree; that Maria provided the majority of the physical care for the child; that Joseph did change some diapers, but not often; and that they had different perspectives on his involvement. Joseph felt that "the mother wanted to provide that care and . . . he perhaps didn't have as much opportunity to do it because the mother insisted on doing it herself, where as the mother's perspective is that he was more interested in other things, was not interested in taking care of the child."

Asked for his recommendation to the court, Mr. Towle ventured: "if we're going to establish if there is a bond between the father and the child, absolutely, and what that would mean in terms of separating the child from the father, then I would say that we would need more information to be able to establish that. . . . If we want to know for sure what the possible repercussions are from allowing the move we would have to have more information than I have now."

The court also elicited testimony from Maria that the child called Joseph "Da Da," and that she let N. call him "Da Da," even though both Maria and Joseph knew from the beginning that he "wasn't the father."

At the end of the hearing the court requested letter briefs from the attorneys on "the threshold issue [of] whether or not [Joseph] has standing in this case as a presumptive father." Letter briefs were submitted. Joseph's brief included a Father's Day card signed "N[.]" in a childish scrawl and stating in part "From your Daughter I admire you, Dad . . . Happy Father's Day!"

On March 14, 2003, the court issued a "Decision and Orders Re: Petitioner's Ability to Asert [*sic*] Standing in this Matter" in which the court found: "1. [T]his case can be distinguished from *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932], . . . based on the fact that the minor in this case has a loving Mother who has been her primary care provider for her entire life. [Maria] is a fit parent. *Nicholas H.* had no fit biological parent that wanted to provide a loving home for this child. [¶] 2. A paternity test has determined that [Joseph] is not the biological Father. [¶] 3. The couple never believed that he was the biological Father. The couple lived together and [Joseph] assisted [Maria] in raising the minor much like a friend or relative might in a shared housing situation. [¶] 4. To extend the *Nicholas H.* case to this setting would be to invite boyfriends, uncles, or housemates to begin to petition the court for standing in matters where they may have assisted the mother for a period of time with a child, however have no biological or primary attachment for and to the child. [¶] 5. In this case granting such standing would have the effect of not allowing a Mother to move to a community where she has extended family and the promise of a job in order to analyze the exact depth of bond between [Joseph] and the Child. That is probably not what the court in *Nicholas H.* contemplated when they gave the six year old the permanency of a loving home with the only adult that was fit and stepping forward to continue to love him and care for him. [¶] 6. Eric Towle with Family Court Services determined that this child was not so deeply attached to the petitioner that he could see a bond in the short time that he observed them together. He indicated had there been a strong bond that it would have withstood the period of time that the child had not seen [Joseph]. He would have been able to see a strong bond if it had ever been there. No such bond existed. Towle said that further assessment could determine the level of the bond because some bond should exist if they lived together for two years, but he did not know what level that would be. [¶] 7. This child does not appear to have been psychologically devastated by the separation of [Joseph] and herself thus far according to the evidence before the Court. [¶] 8. Hence, because we have a loving mother who is the primary caretaker and has and will continue to provide a loving home to her child the Court denies [Joseph's] motion for standing in this matter."

## CONTENTIONS

Joseph contends, based on our Supreme Court's decisions in *In re Nicholas H., supra,* 28 Cal.4th 56 (*Nicholas H.*) and *In re Jesusa V.* (2004) 32

Cal.4th 588 [10 Cal.Rptr.3d 205, 85 P.3d 2] (*Jesusa V.*), that the presumption of paternity established by section 7611, subdivision (d) is not rebutted by evidence of biological nonpaternity, that *Nicholas H.* and *Jesusa V.* are not limited to dependency actions, and that the trial court erred in finding that he did not have standing to pursue his claim of paternity as a presumed father under section 7611, subdivision (d). He also claims that Maria should be estopped from challenging the voluntary paternity declaration they both signed, and that the trial court should not have decided disputed factual issues in a summary adjudication without a full hearing.

Maria responds that Joseph not only lacked standing to claim paternity under section 7611, subdivision (d) because "at best he held the child out as his own," the court in fact determined on the merits that the presumption of paternity arising under section 7611, subdivision (d) was rebutted by clear and convincing evidence that Joseph was not N.'s biological father and by Mr. Towle's testimony that N. was not strongly bonded to Joseph. She also argues that she is not estopped from challenging Joseph's voluntary acknowledgment of paternity, in which she joined, because she moved to rescind the voluntary declaration of paternity before N. turned two years old, she never led Joseph to believe he was N.'s biological father, and she never sought judicial or quasi-judicial relief—such as child support—on the basis of the voluntary declaration. Because we find that the trial court did not make a ruling on the merits of Joseph's paternity claim and erred in finding that he lacked standing under *Nicholas H., Jesusa V.,* and the relevant statutes, we do not reach Joseph's remaining claims.

## DISCUSSION

1. *Applicability of* Nicholas H. *and* Jesusa V.

■ In *Nicholas H.*, our Supreme Court interpreted section 7612, subdivision (a)'s provision that "a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and *may* be rebutted *in an appropriate action* only by clear and convincing evidence." (Italics added.) The court held: "When it used the limiting phrase *an appropriate action*, the Legislature was unlikely to have had in mind an action like this—an action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611[, subd.] (d) presumption will render the child fatherless. Rather, we believe the Legislature had in mind an action in which another candidate is vying for parental rights and seeks to rebut a section 7611[, subd.] (d) presumption in order to perfect his claim, or in which a court decides that the legal rights and obligations of parenthood should devolve upon an unwilling candidate." (*Nicholas H., supra,* 28 Cal.4th at p. 70.) Thus, viewing the evidence in the light most favorable to the trial

court's findings and orders (*id.* at p. 61), the Supreme Court upheld the trial court's exercise of discretion in "concluding that this case, in which no one else was a candidate for the privilege and responsibility of fathering this little boy, was not an appropriate action in which to find that the section 7611[, subd.] (d) presumption of fatherhood had been rebutted" by evidence that the presumed father was not also the boy's biological father. (*Id.* at p. 59, italics omitted.)

In *Jesusa V.*, the court reaffirmed its holding in *Nicholas H.*, finding that as between *two* presumed fathers, it was the nonbiological presumed father whose paternity claim was " 'founded on the weightier considerations of policy and logic' " within the meaning of section 7612, subdivision (b). (*Jesusa V., supra,* 32 Cal.4th at p. 604.) After *Jesusa V.* it is absolutely clear that biology is not the determinative factor in resolving paternity disputes under our statutory scheme.

Here, the trial court found that *Nicholas H.* was *not* controlling because N., unlike Nicholas, already had one fit parent, her mother. In other words, the trial court sought to limit *Nicholas H.* to the dependency context. In our view, *Nicholas H.* cannot be fairly limited in that way. Nothing in *Nicholas H.* or *Jesusa V.* suggests that sections 7611 and 7612 should be construed as making biology determinative of paternity in adoptions, family law matters and UPA petitions, but not in dependency cases. The clear import of *Nicholas H.* and *Jesusa V.* is that whenever possible, a child should have the benefit of *two* parents to support and nurture him or her. The court's concern, stated repeatedly, was that biology should not be used to render children *fatherless.* The fitness or unfitness of the mother did not figure in the equation.

Nor do we agree with the trial court's finding that applying "*Nicholas H.* case to this setting would be to invite boyfriends, uncles, or housemates to begin to petition the court for standing in matters where they may have assisted the mother for a period of time with a child, however have no biological or primary attachment for and to the child." As we see it, the import of *Nicholas H.* is that a boyfriend, uncle or housemate who receives a child into his home and holds the child out as his own is not disqualified from asserting parental rights and responsibilities to the child by virtue of his lack of a biological attachment.

We find that insofar as the trial court refused to apply *Nicholas H.* to the paternity action before it because N. was not a dependent child, and gave considerable weight to Joseph's biological nonpaternity of N., the trial court erred.

## 2. *Standing*

Accordingly, we now turn to the question whether Joseph had standing to bring a UPA petition to establish his paternity to N.

### *Standard of Review*

■ The question before us—whether Joseph meets the relevant statutory criteria for standing to sue for establishment of paternity to N.—calls for statutory interpretation of sections 7630, subdivision (b) and 7611, subdivision (d). Statutory interpretation is a question of law, which appellate courts review de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) Initially, however, that question also calls for an examination of the underlying factual predicate for application of the statutes. Because we find that the relevant evidentiary record on that point is both sufficient and undisputed, our review is de novo. (Cf. *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611–612 [38 Cal.Rptr.2d 150, 888 P.2d 1279] [application of statute of limitations presents a question of law, where "relevant facts are not in dispute"].) We therefore independently review all aspects of the case before us, including the determination that a factual predicate exists for application of sections 7630, subdivision (b) and 7611, subdivision (d).

### *Standing Defined*

■ Black's Law Dictionary defines standing as a "party's right to make a legal claim or seek judicial enforcement. . . . Also termed *standing to sue.*" (Black's Law Dict. (8th ed. 2004) p. 1442, col. 1.) "A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on the merits. [Citation.] . . . We will not address the merits of litigation when the plaintiff lacks standing, because ' "California courts have no power . . . to render advisory opinions or give declaratory relief." ' [Citation.] Standing ' "goes to the existence of a cause of action." [Citation.]' (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320.) [¶] . . . [¶] 'Standing requirements will vary from statute to statute based upon the intent of the Legislature and the purpose for which the particular statute was enacted.' [Citation.]" (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1000–1001 [24 Cal.Rptr.3d 474].)

### *Statutory Criteria for Standing Under Section 7630, Subdivision (b)*

■ Section 7630, subdivision (b) provides that "[a]*ny interested party* may bring an action at any time for the purpose of determining the existence

or nonexistence of the father and child relationship presumed under subdivision (d) or (f) of Section 7611." (Italics added.) Notably, this section does not condition standing on biology or depth of bond, the two criteria used by the trial court to deny Joseph standing. The relevant inquiry under the statute is whether the prospective plaintiff claiming presumed father status under section 7611, subdivision (d) can allege facts that bring him within the statutory language of that subdivision. "Under section 7630, subdivision (b), any interested party may bring an action to determine the existence of the father and child relationship presumed under section 7611, subdivision (d). This is in contrast to section 7630, subdivision (a), which limits the class of men who can bring actions to declare the existence of the father and child relationship pursuant to section 7611, subdivisions (a), (b), and (c), to the presumed fathers. Thus, *a broad class of men,* including ' "alleged" ' fathers, can bring an action to establish paternity when such claim is based on the presumed father status which is obtained by receiving the child and openly acknowledging paternity." (*Miller v. Miller* (1998) 64 Cal.App.4th 111, 116–117 [74 Cal.Rptr.2d 797], italics added.)

The "broad class of men" who have been held to have statutory standing to sue for paternity as an "interested person" have included the second husband and putative father of the wife's third child born while she was married to the first husband, because he took the child into his home and held her out as his own, although he did not prevail against the nonbiological first husband's claim to paternity on the merits (*Miller v. Miller, supra,* 64 Cal.App.4th at pp. 117–118). It has also been held to include the putative father of the child of the man's former lover, when the man had lived with the child and her mother (who was married to someone else) during the first year and a half of the child's life, and continued to visit with the child after the mother and putative father separated, until the mother cut off all contact between the putative father and the child when she reconciled with her husband (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198 [92 Cal.Rptr.2d 294]; see also *Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36 [22 Cal.Rptr.3d 606] [putative father alleged that child stayed in his home every other weekend for child's first year, until mother and husband reconciled, and that he held child out as his own son, although mother and her husband disputed the latter allegation].) Read in a gender-neutral fashion, the class of interested persons has even been held to include a 12-year-old girl who sued for recognition of a mother-child relationship with the non-biologically-related woman who raised her. (*In re Karen C.* (2002) 101 Cal.App.4th 932 [124 Cal.Rptr.2d 677].)

█ As noted at the outset of this opinion, under section 7611, subdivision (d), "[a] man is presumed to be the natural father of a child if he . . . [¶] . . . [¶] receives the child into his home and openly holds out the child as his natural child." The allegations of the petition, as well as the undisputed evidence before the trial court, established both of those conditions. N. lived

in Joseph's household from the time of her birth until her mother removed her from his house at 22 months. As even Maria concedes, Joseph held N. out as his own child. He signed a voluntary declaration of paternity so that he could provide her with medical and other benefits. So far as may be inferred from the parties' declarations and testimony, Joseph financially supported N. and Maria first with his earnings, and then with his disability payments, from the time Maria became unemployed in May 2001 until she left Joseph's home in January 2003. N. called Joseph "Da Da." By any measure, Joseph qualified as "an interested party," and section 7630, subdivision (b) supported his bid for legal recognition of a parent-child relationship between him and N. premised on the rebuttable presumption of paternity contained in section 7611, subdivision (d). He was entitled at least to a determination on the merits that he (1) proved by a preponderance of the evidence that he is, in fact, N.'s presumed father—or that (2) his case presents "an appropriate action in which to find that the section 7611(d) presumption of fatherhood had been rebutted" by clear and convincing evidence *other than* blood tests confirming his biological nonpaternity. (*Nicholas H., supra,* 28 Cal.4th at p. 59, italics omitted. See also *In re Raphael P.* (2002) 97 Cal.App.4th 716, 734 [118 Cal.Rptr.2d 610] ["sections 7551 and 7554 do not . . . authorize courts to order genetic testing of a man who meets the statutory test for presumed fatherhood. It follows that if appellant met that test, the court should not have ordered him to undergo genetic testing, much less allow the evidence of biological nonpaternity to rebut appellant's presumed father status" (italics omitted)]; see also *Nicholas H., supra,* 28 Cal.4th at pp. 69–70 [quoting passage from *Raphael P.* with approval].)

Maria argues, however, that even though the court couched its findings and order in terms of lack of standing, in effect the trial court found against Joseph on the merits. The court did make some factual findings about Joseph's biological nonpaternity, and about the relative depth of N.'s bond with him as compared with N.'s bond with her mother. These findings suggest that the court had made a ruling on the merits. On the other hand, these same findings also imply that the court denied Joseph standing *for the very reason* that it had *already determined* that Joseph was not a presumed father. If this is what the court in fact did, it was putting the cart before the horse, in violation of section 7630, subdivision (b) which plainly confers standing on "any interested party" in order to *determine* whether the presumption of paternity created by section 7611, subdivision (d) does or does not exist.

In any event, we are not convinced, on this record, that the court did make a ruling on the merits rather than a ruling on standing. Inasmuch as the court erred in finding that *Nicholas H.* had no application to the situation before it,

and that biology and depth of bond precluded standing, we must reverse the order dismissing Joseph's paternity action and remand for a new hearing on the merits of his petition.

On remand, Joseph may present additional evidence on issues bearing on the establishment or rebuttal of his presumed fatherhood pursuant to section 7611, subdivision (d). Pursuant to California Rules of Court, rule 1413(e)(2), "[t]he court may make its determination of paternity or nonpaternity based on the testimony, declarations, or statements of the mother and alleged father" (see *Jesusa V., supra,* 32 Cal.4th at pp. 600–601), keeping in mind that "[w]hen it used the limiting phrase *an appropriate action,* the Legislature was unlikely to have had in mind an action like this—an action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611(d) presumption will render the child fatherless." (*Nicholas H., supra,* 28 Cal.4th at p. 70.)

Finally, we cannot agree with the trial court's assessment that "[i]n this case granting [Joseph] standing would have the effect of not allowing a Mother to move to a community where she has extended family and the promise of a job." On remand, Joseph will have the burden of proving by a preponderance of the evidence that he is N.'s presumed father by virtue of the fact that he took her into his home and openly held her out as his natural child. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653 [56 Cal.Rptr.2d 524].) Assuming he carries that burden, the court will then have to decide whether this is an appropriate action in which to find that clear and convincing evidence rebuts the presumption. Only if the court decides that the presumption is *not* rebutted will it be required to decide questions concerning Maria's move and Joseph's visitation using a "best interest of the child" analysis. (*Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989 [20 Cal.Rptr.3d 522].)

## CONCLUSION

 Section 7630, subdivision (b) confers standing on "any interested party" for the purpose of determining presumed fatherhood under section 7611, subdivision (d). *Nicholas H.* teaches that biology is not determinative of paternity. Joseph is an interested person who has standing to pursue the establishment of a parent-child relationship with N. as her presumed father under section 7611, subdivision (d) because he has demonstrated that he took her into his home and held her out as his own child. Therefore, the court erred in finding that he lacked standing to bring a paternity action and he is entitled to a hearing on the merits of his petition.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a hearing to determine on the merits whether appellant Joseph is the presumed father of N. under section 7611, subdivision (d). If the court finds that he is a presumed father, it shall proceed to determine the remaining issues raised in the proceedings. If the court finds that appellant is not N.'s presumed father, it shall enter a new order expressly denying his petition. Appellant is entitled to costs on appeal.

Rushing, P. J., and Walsh, J.,* concurred.

---

*Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.