BOSSON, Justice (specially concurring). {54} I agree with the outcome reached by the majority, but on narrower grounds. I write out of concern that this Opinion might be interpreted to expand the population of presumed parents in a manner that would shake settled expectations of custody rights and child support responsibilities. If interpreted narrowly, the majority Opinion applies existing law to evolving, contemporary fact patterns, which is a good thing. If interpreted broadly, however, the majority Opinion could be read to impose seismic changes in custody and child support relationships that neither the New Mexico Uniform Parentage Act (UPA), NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through 2004), nor sound policy authorizes, at least not in my judgment. {55} The majority Opinion holds that Chatterjee has standing to pursue shared custody of Child because the presumptions of paternity listed in Section 40-11-5 of the applicable UPA apply equally to women as presumptions of maternity when practicable. See supra ¶¶ 5-6, 10-37. In order to reach this conclusion, I believe we need to address other questions that do not hinge upon Chatterjee’s gender. First, when is a nonadoptive, nonbiological individual a presumed parent under the holding-out provision of the UPA? Then, when does biology (the lack of a biological relationship) rebut such a presumption of parentage? {56} Without answering these questions, the majority Opinion concludes that Chatterjee has standing to pursue custody because “[hjer pleading sets forth facts, which, if true, establish that she has a personal, financial, and custodial relationship with Child and has openly held Child out as her daughter, although she is neither Child’s biological nor adoptive mother.” See supra ¶ 4. But is concluding that Chatterjee has openly held out Child as her daughter the end of the inquiry? Not in my opinion. {57} Let me explain my concerns through a hypothetical. Suppose a hypothetical Mother has two children with men who are no longer involved in their lives for whatever reason, including death. Eventually, Mother begins a serious relationship with a hypothetical Man who moves in and lives happily with Mother and her two young children. Man assists in financial aspects of the household, which almost automatically includes expenses that support the children. At times he refers to himself as the children’s father, for example in conversations with neighbors, perhaps on school documents and so forth, either for convenience purposes or perhaps because he truly does wish to become the children’s father. Mother may or may not know that Man refers to himself in this way, but we will assume she does. Mother actively considers the possibility of marriage and that some day Man might adopt her two children. {58} After a few years, however, the relationship sours, and Mother asks Man to leave. It is over. But Man decides he does not want it to end entirely; he wants to share legal custody over the two children. Perhaps his motives are pure; perhaps he is just vindictive and extortionate. Whatever the motive, he alleges standing as a presumed father who has held out the children as his “own” and has established a financial, personal, and custodial relationship with them. He files in court and, as a presumed father, demands a full-blown custody hearing to prove his merits. The best interests of the children, he argues, require his presence in their lives, and Mother, whether out of spite or sincerity, is not acting in a manner consistent with those best interests. Mother finds herself in a custody battle to retain control over her own children. {59} A claim of presumed parenthood can be equally abused in the other direction. Perhaps Man chooses to end the relationship, never really interested in custody over the children. But it is the Mother who demands permanent child support from him, alleging that Man has become, however reluctantly, a presumed father by virtue of his holding out. {60} Neither ofthese scenarios strikes me as desirable from a policy point of view. They appear to run counter to conventional expectations among both professionals and the public at large. After all, the Mother in my hypothetical, completely fit as a parent, has never agreed to surrender her custodial rights to anyone. Should my hypothetical Man even have standing to pursue his claim? According to my reading of the UPA, such claims veer far outside the essential intent and structure of the statute. Yet we need to be careful, lest the majority Opinion be read to lay a legal basis for such claims. {61} The majority Opinion is not clear what facts Chatterjee has alleged sufficient to establish that she openly held out Child as her own. Therefore, it is also not clear whether hypothetical Man, like Chatterjee, would have standing to pursue custody as a “presumed parent” under the holding-out provision. I believe Chatterjee’s situation is distinct, and I write to explain why. Without this clarification and resulting narrowing of the Opinion, I fear the consequences of my hypothetical. As explained earlier, I fear that Man could force Mother to defend her sole custody rights in court, leaving the ultimate determination to a best-interests analysis by a judge, and only after prolonged, highly expensive, and totally unnecessary litigation, And, to make matters worse, if Man has deeper pockets than Mother, he might well win. {62} The majority states that “New Mexico courts have long recognized that children may form parent-child bonds with persons otherthan their legalparents.”[10] ¶ 35. While I do not disagree, the point seems irrelevant, unless everything boils down to a “best interests” determination. For most of this Court’s history, “the primary purpose of paternity suits [was] to insure the putative father meets his obligation to help support the child.” Aldridge ex rel. Aldridge v. Mims, 118 N.M. 661, 665, 884 P.2d 817, 821 (Ct. App. 1994) (citing State ex rel. Human Servs. v. Aguirre, 110 N.M. 528, 530, 797 P.2d 317, 319 (Ct. App. 1990)); see also In re Estate of DeLara, 2002-NMCA-004, ¶ 10,131 N.M. 430, 38 P.3d 198 (“The primary purpose of a paternity proceeding is to compel the father to support his child. Our Supreme Court has characterized child support as a parent's most important single obligation.....The state also has an interest in children being supported by their father. Our law reflects a strong public policy in favor of support. We interpret the UPA against this backdrop.” (internal quotation marks and citations omitted)). {63} In fact, there is only one prior New Mexico case in which a litigant cited the UPA as the basis for establishing parentage and thus, for standing to gain custody rights for a presumed father as opposed to child support from one. See Lane v. Lane, 1996-NMCA-023, ¶ 10, 121 N.M. 414, 912 P.2d 290. All other New Mexico cases apply the UPA to establish paternity in the child support context or in the context of paternal grandparents seeking visitation rights. And, as we shall see, the putative father in Lane was not successful under the holding-out provisions of the UPA. Ld. ¶ 11. Given this limited history, this case poses questions of first impression regarding the UPA for which we truly do not have precedent. While it is self-evident that Chatterjee should have the same rights as a similarly-situated male, the more basic question asks whether and under what circumstances should such a male have standing to be considered a presumed natural parent under the Act. {64} We have certain traditional legal avenues for asserting parental rights over nonbiological children, primarily through adoption. Adoption can be complicated but, at the very least, it has a set legal protocol. It alerts everyone concerned, just like executing a will, of the solemnity of the occasion and its permanent consequences. “[Tjhere are advantages to the formality of court-approved adoption pursuant to statute. The formality of the occasion impresses upon those involved the importance of making a considered decision. To predicate an adoption on simply the existence of a loving relationship may often produce results contrary to the intent of those involved.” Otero v. City of Albuquerque, 1998-NMCA-137, ¶ 15, 125 N.M. 770, 965 P.2d 354 (citations omitted)). {65} We should be wary of interpreting statutes in a way that would dilute the need for such formality, relying instead upon the more ambiguous standard of “best interests.” Thus, legal parenthood by holding out should generally track the requirements for legal descendance by holding out, also known as “equitable adoption,” which is construed narrowly, see Poncho v. Bowdoin, 2006-NMCA-013, ¶¶ 19-36, 138 N.M. 857, 126 P.3d 1221 (rejecting a biological father’s argument that another man had equitably adopted his son, made in order to avoid paying child support). The least needed for an equitable adoption is that ‘“acts or omissions induced the child to believe that [the child] was the foster parent's biological or formally adopted child.’” Otero, 1998-NMCA-137, ¶ 6 (quoting Jan Ellen Rein, Relatives by Blood, Adoption, and Association: Who Should Get What and Why, 37 Vand. L. Rev. 711, 767 (1984)). Presumed Parenthood Under the “Openly Holds Out” Presumption {66} Section 40-11-5 of the UPA lists circumstances under which a man should be presumed to be the “natural father” of a child, including the “openly holds out” provision. While I believe that the term “natural” generally means biological, the “presumptions of paternity” are just presumptions. Thus, to be a presumed natural father, one need not be an actual biological father. The UPA anticipates that there may be multiple presumed fathers, foreclosing the possibility that all presumed natural fathers are biologically related to a child. See § 40-11-5(B) (“If two or more men are presumed under this section to be the child’s father, an acknowledgment by one of them may be effective only with the written consent of the other or pursuant to Subsection C of this section.”). Thus, I agree with the majority that we are not precluded from considering Chatterjee a presumed parent on the basis of biology alone. Unfortunately though, biology would also not preclude my hypothetical Man from asserting a “presumed father” status — which I submit most observers would agree is not a good thing — unless we examine more closely what it takes to qualify as a “holding out” parent. I now turn to that question. {67} The holding out provision under Section 40-11-5(A)(4) requires that “[a man] openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child.” Although,“natural” in the context of “natural child,” again, likely means biological in most cases, the provision does not require an assertion of, or an actual, biological relationship. It just requires that a presumed parent hold a child out as a natural child, meaning treating the child in the same way that a person would treat his or her biological child. Whether Chatterjee can allege that she has established a personal, financial, or custodial relationship with Child is not yet at issue. Whether Chatterjee “openly held out [Child] as [her] natural child,” and exactly what that means, definitely is at issue. So too, is what my hypothetical Man should be required to allege by way of holding out before he could gain “presumed natural parent” status under the UPA and force hypothetical Mother to defend her sole custody status in court. {68} Cases from our own Court of Appeals as well as from California jurisprudence illustrate at least three common themes that define holding out a child as one’s natural child. In each, the presumed parent (1) acted as a parent from the time the child was born or adopted; (2) assumed ongoing responsibilities to the child through legal and financial declarations; and (3) was recognized by the child’s family, including another parent or the child, as the child’s parent. This strikes me as a narrower class of presumed parents and significantly so, one that might just deter hypothetical Man from pursuit of custody. {69} “[T]he purpose behind the presumed parent designation ... ‘is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.’” S.Y. v. S.B., 134 Cal. Rptr. 3d 1, 11-12 (Dist. Ct. App. 2011) (quoting In re Sabrina H., 217 Cal. App. 3d 702, 708 ( Dist. Ct. App. 1990)). A party acts as a parent from birth or adoption when, for example, he “enjoy[s] regular visitation with each child since birth,” Mintz v. Zoernig, 2008-NMCA-162, ¶ 11, 145 N.M. 362, 198 P.3d 861, he treats the child as his own from the child’s birth until years later when the mother no longer permits it, Lane, 1996-NMCA-023, ¶¶ 5-7, or he lives with the child from the child’s birth until the baby is 22 months old and supports the child and mother financially with earnings until the mother no longer permits it, Librers v. Black, 28 Cal. Rptr. 3d 188, 190 (Dist. Ct. App. 2005). {70} A party assumes ongoing responsibilities through legal or financial declarations, for example, when he asserts his visitation rights in court, acknowledges that he is the natural father of children in a stipulated order, and is registered as the father with the vital statistics bureau. See Mintz, 2008-NMCA-162, ¶ 11. Or, he does so when he appears on a child’s birth certificate and lists the child as a child of the marriage in divorce document. See Lane, 1996-NMCA-023, ¶ 6. Or, he does so when he signs a voluntary declaration ofpaternity so that he could provide the child with medical and other benefits. See Librers, 28 Cal. Rptr. 3d at 190. A party is recognized as a parent by another parent and by the child when, for example, he along with his wife tells family and friends that a child is his and his wife encouraged him to be an active parent, Lane, 1996-NMCA-023, ¶ 5, when the child calls him “T)a.T> a,” Librers, 28 Cal. Rptr. 3d at 190, when the child believes he is her biological father due to both her parents’ behavior and assertions, Lane, 1996-NMCA-023, ¶ 3, or when he is asked, and agrees, to be the male role model in the children’s lives and is the only other parent the children have known, see Mintz, 2008-NMCA-162. {71} In S. Y., the California case with facts most similar to Chatterjee’s allegations, a host of factors led to the reviewing court’s conclusion that a woman held two adopted children out as her natural children under the UPA holding-out provision. 134 Cal. Rptr. 3d at 11. The woman acted as a parent from the time the children were adopted until her partner refused to allow her to do so. Id. She acted as a parent by telling her partner, with whom she had a committed relationship, that she would support the partner and co-parent a child when her partner sought to conceive and then adopt; she then assisted with the children’s care, finances and activities, and allowed her partner to use her middle name as part of one of the children’s names. Id. The woman assumed ongoing financial obligations by naming the children as beneficiaries on “everything.” Id. The children and the woman’s partner recognized the woman as the children’s mother by giving her Mother’s Day cards year-after- year, and by participating in a ceremony typically only attended by family members. Id. In addition, the woman’s parents considered and treated the children as their grandchildren in terms of shared time and financial savings. Id. {72} Chatterjee’s allegations are likewise sufficient to establish that she held Child out as her natural child. Chatterjee acted as a co-parent to Child for many years and until King refused to allow her to do so. Like the woman in S.Y., Chatterjee was in a committed relationship with King when, together, they brought Child into their home. Chatterjee and King brought Child to the United States from Russia, with the intention Child would have two mothers. The only reason King’s, and not Chatterjee’s, name appeared on the adoption papers was their mutual agreement not to risk complications from Russian law and custom in regard to same-sex adoption and Chatterjee’s ethnic origin. Child went by a combined surname, including Chatterjee’s last name. Chatterjee assumed ongoing obligations by naming Child as a dependent on her health insurance plan and retirement plan. Child and King referred to Chatterjee as Child’s mother. Chatterj ee and King told others that Chatterjee was Child’s mother. Comparatively, Chatterjee alleges more facts than the woman in S.Y.; Chatterjee held out Child as her own in the same way that King held out Child as her own from the time Child came into their lives and until King terminated Chatterjee’s visits with Child. {73} Under this high standard for “hold[ing] out,” my hypothetical Man rightfully would have a difficult case to allege, much less prove, that he was a “presumed natural parent.” In the hypothetical, Man was not involved in bringing Mother’s children into the household, unlike Chatterjee who helped create the essential familial relationship. The children would not use or have Man’s name. Man may or may not have listed the children formally on any legal documents as his own or as dependents in any formalized manner. It is not clear what role the children or the children’s Mother would have considered hypothetical Man to have. To even come close to presumed parent status, Man must not just prove, but he must initially allege such facts. Hypothetical Man would have to make clear whether the children or Mother represented Man to others as the children’s father, and in what context, or whether anyone else in the children’s family would have believed Man to be the children’s father. There would have to be evidence and allegations that hypothetical Man had assumed ongoing financial or legal obligations for the children. {74} Absent most of the foregoing, I do not believe that hypothetical Man could even allege that he has held himself out as a presumed natural parent. Thus, unlike Chatterjee, he would not have standing under the UPA, thereby avoiding the seismic shift in settled legal expectations that I outlined at the beginning of this discussion. Similarly, hypothetical Mother could not seek child support from hypothetical Man under the holding-out provision. All this follows, and justly so, as long as we take a disciplined view of what it really takes to become a presumed natural parent. {75} My narrow view of what it means to be a presumed natural parent by holding out draws support from subsequent modifications to the UPA. The modern UPA drafters had similar concerns. They addressed those concerns explicitly when they amended the model UPA in 2002, although it does not provide for situations in which a child is adopted. The new model UPA, adopted in 2002, and the present-day UPA, adopted in 2009, amend the presumption of fatherhood so that it applies only to persons who, for “the first two years of the child's life, reside[s] . . . in the same household with the child and openly h[olds] out the child as [his or her] own." UPA § 704 (1973); accord NMSA 1978, § 40-11A-704 (2009) (emphasis added). The comments explaining this change state that [bjecause there was no time frame specified in the 1973 act, the language fostered uncertainty about whether the presumption could arise if the receipt of the child into the man's home occurred for a short time or took place long after the child's birth. To more fully serve the goal of treating nonmarital and marital children equally, the “holding out” presumption is restored, subj ect to an express durational requirement that the man reside with the child for the first two years of the child's life. UPA § 704. {76} While we cannot rely solely on statutory amendments to the New Mexico UPA that occurred after the events of this case, the amendment does afford some indication of the correct policy envisioned by our Legislature. I believe our Legislature intended from the beginning that the holding-out provision should apply narrowly to the very creation of the family unit and not loosely to a subsequent relationship formed years later. Rebutting the Presumption of Parenthood {77} When should a court rebut a presumption of parentage based on holding out? We have never addressed this question, but several years ago our Court of Appeals did, perhaps precipitously, in Lane, 1996-NMCA-023. In Lane, evidence that the presumed father was not the biological father was held to rebut a presumption of natural parentage based on holding out. Id. ¶ 10. The UPA directs, however, that a presumption of natural parenthood “may” be rebutted in an “appropriate action,” suggesting a less mechanical approach. See § 40-ll-5(C). {78} Long before the UPA, courts grappled with when to allow evidence of biology to interfere with established familial units. The presumption of legitimacy was a fundamental principle of the common law. Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. As explained by Blackstone, nonaccess could only be proved “if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, extra quatuor maria [beyond the four seas]) for above nine months . . . .” And, under the common law both in England and here, “neither husband nor wife [could] be a witness to prove access or nonaccess.” The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, thereby depriving them of rights of inheritance and succession, and likely making them wards of the state. A secondary policy concern was the interest in promoting the “peace and tranquillity of States and families,” a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, “[j]udges in both [England and the United States] gradually widened the acceptable range of evidence that could be offered by spouses, and placed restraints on the ‘four seas rule’ ...[,] the law retained a strong bias against ruling the children of married women illegitimate. Michael H. v. Gerald D., 491 U.S. 110, 124-25 (1989), rehearing denied, 492 U.S. 937, and superseded by statute as stated in Jones v. Trojak, 586 A.2d 397 (Pa. Super. Ct. 1990) (citations omitted). {79} The majority asserts that “the Court of Appeals recognized the importance of considering the child’s best interest when making a paternity determination” in Tedford v. Gregory, 1998-NMCA-067, 125 N.M. 206, 959 P.2d 540. See supra ¶ 46. To clarify, Tedford recognized that a child’s best interests is a factor in determining whether to rebut a presumption of natural parentage in some jurisdictions, once a presumption of paternity is established. 1998-NMCA-067, ¶ 15. This means that, before best interests becomes part of the paternity analysis, a parent must establish presumed parenthood, such as through the holding-out provision of the UPA. For example, if a biological father challenges another presumed parent’s relationship after a child has established a father-child relationship with the presumed father, then a court would be justified in not permitting biology to rebut the presumption. See Tedford, 1998-NMCA-067, ¶ 15. This is because “when the child involved in such proceeding is a minor and has developed a close emotional attachment to the presumed parents ... court recognition of another parent would be emotionally or otherwise damaging to the child.” Id. ¶ 17. Tedford recognized that a best interests of the child theory should apply to protect a child from losing a parent, rather than to protect a parent from payment of child support. Id. ¶ 18. {80} This Tedford dicta closely tracks the reasoning employed in California cases, such as In re Raphael P., 118 Cal. Rptr. 2d 610 (Dist. Ct. App. 2002). In re Raphael P. held that when there are “competing claims of would-be parents who wished to raise the child,” then “[fjollowing the biological tie did not deprive the child of a parent.” Id. at 623. As such, a biological determination of parenthood was appropriate. Conversely, determining parenthood through biology would be inappropriate if a finding of a biological tie would override an existing familial relationship. Id. at 624. The court noted that the UPA provisions describing genetic and blood tests refer to testing “alleged” fathers, not “presumed fathers,” suggesting that biology should not generally rebut presumed parenthood. Id. at 625. {81} The California Supreme Court applied this reasoning most famously in In re Nicholas H., when an admittedly nonbiological, presumed father sought custody of a boy whose mother was not able or willing to care for him and no other man claimed fatherhood. 46 P.3d 932, 934 (Cal. 2002). The California Supreme Court reasoned that the case was not the “appropriate action” for rebuttal of a parental presumption: “the Legislature is unlikely to have had in mind an action like this — an action in which no other man claims parental rights to the child, an action in which rebuttal of the [statutory] presumption will render the child fatherless.” Id. at 941. {82} California courts have continued to apply this logic, not permitting biology to rebut a parental presumption based on holding out, in diverse scenarios. See, e.g., Elisa B. v. Superior Ct., 117 P.3d 660 (Cal. 2005); Librers, 28 Cal. Rptr. 3d 188. In. Librers, the trial court rebutted a boyfriend’s presumption of fatherhood because he was not biologically related to a child. Librers, 28 Cal. Rptr. 3d at 194. The trial judge had worried that recognizing boyfriend as a presumed father would mean that any custodial male of a child could make a claim of presumed fatherhood. Id. at 193. In overturning the trial court’s position, the appellate court agreed that, if a custodial male truly held the child out as his own, such situations were possible: “a boyfriend, uncle or housemate who . . . holds the child out as his own is not disqualified from asserting parental rights and responsibilities to the child by virtue of his lack of a biological attachment.” Id. Significantly, in Librers the boyfriend alleged that he had acted as the father in every way since the child’s birth until the mother refused to let him do so. Id. Likewise, in Elisa B., a woman could not use biology to rebut the presumption that she was a natural mother of her former partner’s children who were conceived by invitro-fertilization once facts established the presumption under the UPA’s holding out provision. 117 P.3d at 670. {83} The bottom line is that a presumption of parentage based on holding out, once properly asserted, is a strong presumption only rebutted in limited circumstances. The new model UPA and modern UPA resolve the issue of rebuttal explicitly, in a way that I believe reflects this case law and the policy behind it. A court may deny genetic testing if “(1) the conduct of the mother or the presumed or acknowledged father estops that party from denying parentage; and (2) it would be inequitable to disprove the father-child relationship between the child and the presumed or acknowledged father.” NMSA 1978, § 40-llA-608(A)(l) and (2) (2009). Then, nine factors provide guidance as to whether to grant a motion for genetic testing: (1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father; (2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child; (3) the facts surrounding the presumed or acknowledged father’s discovery of his possible nonpaternity; (4) the nature of the relationship between the child and the presumed or acknowledged father; (5) the age of the child; (6) the harm that may result to the child if presumed or acknowledged paternity is successfully disproved; (7) the nature of the relationship between the child and any alleged father; (8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child; and (9)other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child. Section 40-11 A-608(B)(1) to (9). Many factors would apply in a future case like Chatterjee’s and would weigh against rebutting her presumption of parentage with genetic testing. See § 40-11A-608(B)(2), (4), (5), (6) & (9). {84} Given the foregoing reasoning, biological evidence should not rebut Chatterjee’s presumption ofparentage because doing so would deprive Child of a parent. Hypothetical Man or hypothetical Mother, on the other hand, cannot establish the parental presumption in relation to hypothetical Man, and therefore, he would have no presumptive parental status to rebut. Thus, while Chatterjee should have standing to pursue custo dy of Child, hyp othetical M an would no t, nor could hypothetical Mother force him to pay child support. RICHARD C. BOSSON, Justice The majority’s assertion that this Court “held that a trial court had the power to award custody to an uncle with whom a child had bonded over the biological mother’s objection, even absent the mother’s unfitness” is not supported by our precedent. See supra ¶ 35 (citing Ex parte Pra, 34 N.M. 587, 588, 590-91, 286 P. 828, 828, 829-30 (1930)). The mother in Exparte Pra was unfit; she had abandoned her one-month-old child, leaving him with the uncle, and then she neglected the child for nine years. Ex Parte Pra, 34 N.M. at 588-89, 286 P. at 829. We clarified that narrow holding in Shorty v. Scott. In Scott we recognized that the mother in Ex Parte Pra “was impliedly found unfit in the overall sense since she had effectively abandoned her child when he was but one month old and totally neglected him for nine years.” 87 N.M. 490, 494 n.8, 535 P.2d 1341, 1345 n.8 (1975). The majority also cites Cook v. Brownlee, 54 N.M. 227, 228-29, 220 P.2d 378, 378-79 (1950) as an example of this Court favoring parent-child bonds over biological relationships. See supra ¶ 35. In that case, we awarded custody to a grandfather over a biological father’s obj ections, but only because the biological father had abandoned his child. Cook, 54 N.M. at 228-29, 220 P.2d at 378-79.