2008-NMCA-162

198 P.3d 861

Janna MINTZ, Petitioner–Appellee,

v.

Kevin ZOERNIG, Respondent–Appellant.

No. 27,794.

Court of Appeals of New Mexico.

July 25, 2008.

Certiorari Denied, No. 31,320, Nov. 6, 2008.

Gerber & Bateman, P.A., Paul D. Gerber, Amber Train, Santa Fe, NM, for Appellee.

Mary Jo Snyder, Santa Fe, NM, for Appellant.

## OPINION

VIGIL, Judge.

{1} In this case, we must decide whether a known sperm donor is responsible for child support when there was an agreement, prior to conception, that he would not be financially obligated. We conclude that while such an agreement may be valid in some instances, where the biological father goes beyond merely donating sperm and assumes a parental role, as in this case, he is liable for child support.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} Mother and biological Father met in the mid–1990's through Mother's same sex partner (Partner). Father, Mother, and Partner maintained a friendship for several years. During that time, Mother and Partner repeatedly asked Father if he would be willing to donate sperm so they could conceive a child. Father ultimately agreed, with the understanding that while he would donate sperm and serve as a male role model for Child, the women would be the primary parents, and he would have no financial obligation for child support. Without the assistance of a licensed physician, Mother then used a syringe-like implement to impregnate herself with Father's donated sperm. Child was born on August 15, 1995. After Child's birth, Father, Mother, and Partner reduced their agreement to writing. However, shortly thereafter, Mother and Partner ended their relationship.

{3} Subsequently, Mother asked Father if he would be willing to donate sperm again under the same conditions, and Father agreed. They entered into an oral agreement stipulating that Father would donate sperm and act as a male role model, but Mother would be the primary parent, with Father having no financial obligation for child support. Mother once again inseminated herself as before. Second Child was born on September 22, 1997.

{4} Both parties acted in accordance with the agreement following the births of both children. Father had significant contact with the children, but Mother served as their primary parent and Father paid no child support. However, in 2000, Mother filed a paternity action, seeking child support for both children. Ultimately, the parties entered into a stipulated order that was approved by the district court and filed on June 12, 2001.

The stipulated order required Father to pay $250 per month in child support, plus $50 per month toward arrears. Father is current on all payments.

{5} In 2004, Mother filed a motion for modification of child support. A motion hearing was held before a hearing officer, which was concentrated on establishing Father's level and source of income. Ultimately, the hearing officer recommended that Father be ordered to pay $670.00 per month in child support. The district court held a hearing on Father's objections and entered its order adopting the hearing officer's recommendations. This appeal follows. Additional pertinent facts are discussed below.

## DISCUSSION

{6} Father appeals, challenging his obligation to provide any support, as well as the adjusted amount of child support.

## I. OBLIGATION TO PAY CHILD SUPPORT

{7} Father appeals the support order, challenging his obligation, as a mere sperm donor, to pay child support. We therefore determine what obligations he has to the children, and whether his agreement not to pay child support is enforceable.

■ {8} We first address whether Father is legally obligated to pay child support. The Uniform Parentage Act (UPA), NMSA 1978, §§ 40–11–1 to –23 (1986, as amended through 2004) provides us with an appropriate analytical framework for deciding this question. The parent and child relationship may be established between a child and the natural father as provided in the UPA, Section 40–11–4(B), and the relationship extends to every child and parent, regardless of the marital status of the parents. § 40–11–3; *see In re Estate of DeLara*, 2002–NMCA–004, ¶ 8, 131 N.M. 430, 38 P.3d 198 ("The UPA deals with establishing paternity.") Under the UPA the "parent and child relationship" is defined as "the legal relationship existing between a child and his natural ... parents incident to which the law confers or imposes rights, privileges, duties and obligations." § 40–11–2 (internal quotation marks omitted).

{9} Father argues that because the children were conceived through artificial insemination, Section 40–11–6 of the UPA, entitled "Artificial insemination," governs. This section states:

Any donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife may be treated as if he were the natural father of the child thereby conceived if he so consents in writing signed by him and the woman. The physician shall certify their signatures and the date of the insemination and file the donor's consent with the vital statistics bureau of the health services division of the health and environment department ... where it shall be kept confidential and in a sealed file; provided, however, that the physician's failure to either certify or file the consent shall not affect the father and child relationship.

§ 40–11–6(B). While this section provides guidance as to parental responsibility of sperm donors in some instances, it does not apply in this case. The plain language of the statute requires the semen be provided to a licensed physician. In this case, the sperm was not provided to a licensed physician, but rather, Mother inseminated herself. As a result, the artificial insemination section of the UPA is not applicable to our facts. *See generally Jhordan C. v. Mary K.*, 179 Cal. App.3d 386, 224 Cal.Rptr. 530, 533 (1986) (finding that where the statute specifies that the semen be provided to a licensed physician, if the artificial insemination occurred outside of the guidance of a physician, the statute does not apply).

{10} Elsewhere, the UPA provides that a man is presumed to be the natural father of a child if,

while the child is under the age of majority, he openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child; or ... he acknowledges his paternity of the child pursuant to Section 24–14–13 NMSA 1978 or in writing filed with the vital statistics bureau of the public health division of the department of health, which shall promptly inform the mother of

the filing of the acknowledgment, and, within a reasonable time after being informed of the filing, she does not dispute the acknowledgment.

§ 40–11–5(A)(4), (5).

■ {11} Here, Father holds himself out to be the children's father and has established a relationship with them. Father has enjoyed regular visitation with each child since birth. In fact, shortly after Mother filed the initial request for support, Father asserted his visitation rights by filing a motion alleging that Mother "has interfered with [his] relationship to children by imposing arbitrary conditions on visitation." Further, in the stipulated order entered into in 2001, Father acknowledged that he is the natural father of children. Finally, Father is registered as both children's father with the vital statistics bureau. Therefore, we hold that Father is the natural father of both children and is subject to all responsibilities therein, including the obligation to pay child support. *See In re Estate of DeLara*, 2002–NMCA–004, ¶ 8, 131 N.M. 430, 38 P.3d 198 ("[The UPA] provides for recovering child support and other costs from the father."); *see generally* § 40–11–15(C)–(F).

{12} Having found Father liable for child support, we must now determine whether he effectively contracted out of his obligation.

{13} At the outset, we note that this is not an anonymous sperm donor case. Such a case would not of itself result in a "parent and child relationship" as defined in the UPA with its consequential rights, privileges, duties, and obligations. In addition, this is not a known sperm donor case in which the donor provided sperm to a licensed physician under an agreement in which it was agreed he would have no rights, privileges, duties, or obligations as a parent, and the UPA does not otherwise establish a parent and child relationship. *See, e.g., Ferguson v. McKiernan*, 596 Pa. 78, 940 A.2d 1236, 1238 (2007) (holding that the agreement, which "feature[s] all the hallmarks of an anonymous sperm donation" and absolved father of child support responsibilities, is enforceable).

■ {14} We therefore recognize that there may be some instances where a father enters into a sperm donation agreement in which he relinquishes both his parental rights and responsibilities. However, that is not the case before us. Here, Father is the natural father and enjoys the rights of parenthood, but entered into agreements prior to conception that purport to absolve him of his responsibility to pay child support. We hold that the agreements are not enforceable and that Father must therefore pay child support for both children.

■ {15} It is well established that a natural father is required to support his children. *State ex rel. Terry v. Terry*, 80 N.M. 185, 187, 453 P.2d 206, 208 (1969). In fact, "[o]ur Supreme Court has characterized child support as a parent's 'most important single obligation.'" *See In re Estate of DeLara*, 2002–NMCA–004, ¶ 10, 131 N.M. 430, 38 P.3d 198 (quoting *Niemyjski v. Niemyjski*, 98 N.M. 176, 177, 646 P.2d 1240, 1241 (1982)). Both the children and the State have an interest in fathers supporting their children. *Id.* "Our law reflects a strong public policy in favor of support." *Id.* (citing *Wallis v. Smith*, 2001–NMCA–017, ¶¶ 9–11, 130 N.M. 214, 22 P.3d 682; *D'Avignon v. Graham*, 113 N.M. 129, 130–37, 823 P.2d 929, 930–37 (Ct. App.1991)). "Under New Mexico law, a biological father cannot walk away from his parental child support responsibilities without court approval." *Poncho v. Bowdoin*, 2006–NMCA–013, ¶ 32, 138 N.M. 857, 126 P.3d 1221 (footnote omitted).

## II. AMOUNT OF CHILD SUPPORT

{16} Father also appeals the child support modification arguing that Mother failed to establish a material change in circumstances justifying modification. In June 2001, Mother and Father entered into the stipulated order regarding child support that the district court approved requiring Father to pay $250 per month in child support. Subsequently, in 2004, Mother filed a motion for modification of child support, asserting that her financial situation had substantially changed because she was no longer receiving distributions from a family business. The district court ultimately increased the child support from $250 per month to $646 per month.

{17} "The determination of child support is within the district court's discretion and we review it on appeal only for an abuse of discretion." *Klinksiek v. Klinksiek,* 2005–NMCA–008, ¶ 4, 136 N.M. 693, 104 P.3d 559. "However, that discretion must be exercised in accordance with the child support guidelines. The trial court abuses discretion when it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *Id.* (internal quotation marks, alterations, and citation omitted).

{18} It is well established that child support orders may be modified. *Spingola v. Spingola,* 91 N.M. 737, 741, 580 P.2d 958, 962 (1978) (stating that child support stipulated agreements involve the rights of children, and "[t]o make such an agreement nonmodifiable would not be in the best interests of the children and ... against the strong public policy of New Mexico"), *superseded in statute on other grounds as stated in Perkins v. Rowson,* 110 N.M. 671, 798 P.2d 1057 (Ct.App.1990). However, in order to modify such an order, a substantial change in circumstances must be shown. *Bustos v. Bustos,* 2000–NMCA–040, ¶ 15, 128 N.M. 842, 999 P.2d 1074 ("The adoption of the guidelines did not nullify the requirement that a parent show a substantial change in circumstances before a district court can modify the parent's support obligation."). "The burden of proof is on the moving party to satisfy the court that the circumstances have so changed as to justify the modification." *Spingola,* 91 N.M. at 742, 580 P.2d at 963. "As to the degree and kind of change in circumstances required, the change must be substantial, materially affecting the existing welfare of the child. The change in circumstances must have occurred since the prior adjudication where child support was originally awarded." *Unser v. Unser,* 86 N.M. 648, 655, 526 P.2d 790, 797 (1974). Once a substantial change in circumstances is established, the court must then evaluate a modification in accordance with the child support guidelines. *See* § 40–4–11.1(A).

{19} Our review of the record indicates that a substantial change in circumstances was not established prior to modification of support. Although Mother argues that her financial circumstances have changed because she is no longer receiving distributions from her family business, no evidence was presented establishing such a change. Further, Mother failed to prove that any such change occurred *since* entry of the original order. While the original stipulated order states that Mother "has had substantial income and the children have trusts set up for their financial needs," no supporting data detailing her income was entered into the record at that time. In addition, at the hearing, Mother failed to offer any income information demonstrating her financial situation in 2001, when the stipulated order was filed. As a result of Mother's failure to document her income prior to the stipulated order, the earliest information available is her 2001 income tax statement. This statement indicates that her income the year she entered into the agreement is approximately the same as her current annual income. In addition, undisputed evidence was presented at the hearing indicating that prior to entry of the stipulated order in 2001, Mother was aware that the family business would not be buying back stock. Despite this knowledge, Mother entered into the agreement. Therefore, Mother failed to establish that a change in circumstances "occurred since the prior adjudication where child support was originally awarded." *Unser,* 86 N.M. at 655, 526 P.2d at 797.

{20} Still, in determining whether to modify a support order, "the controlling influence should be the welfare and best interests of the child[ren]." *Fox v. Doak,* 78 N.M. 743, 744, 438 P.2d 153, 154 (1968). However, Mother failed to present evidence demonstrating how the children's existing welfare was affected by the alleged change in circumstances. In fact, the record shows that the children are well provided for, and the stipulated order states that "the children have trusts set up for their financial needs." Evidence at the modification hearing shows that these trusts are still in place, Mother uses the funds in the trusts for the children's care, and each trust has a substantial balance.

{21} Finally, "[a] duty to support subsequent children ... may be a defense to a

child support increase for the children of the parties." § 40–4–11.1(C)(2)(e). Since the original order, Father has married and fathered three additional children.

{22} Much of the hearing was spent establishing Father's level and sources of income. However, without first determining that a substantial change in circumstances had occurred since entry of the stipulated order, Father's income was irrelevant. In light of Mother's failure to provide evidence of a substantial and material change in circumstances occurring *after* entry of the stipulated order, or evidence of how the children have been affected, coupled with consideration of Father's duty to support his subsequent three children, we find that the district court abused its discretion in modifying the stipulated order.

## CONCLUSION

{23} We hold that while Father is liable for child support, Mother failed to establish a substantial change in circumstances, and therefore the district court abused its discretion in modifying the stipulated order. We reverse and remand for rehearing consistent with the foregoing.

{24} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and IRA ROBINSON, Judges.