**Certiorari Granted, September 20, 2013, No. 34,291**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-095**

**Filing Date: July 24, 2013**

**Docket No. 31,182**

**MARIA MAGDALENA AEDA, a/k/a
MAGDALENA GIRON,**

        **Petitioner-Appellee,**

**v.**

**OSAMAH AEDA,**

        **Respondent-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Michael Murphy, District Judge**

Magdalena Giron
Las Cruces, NM

Pro Se Appellee

Keithly & English, P.C.
Shane A. English
Anthony, NM

for Appellant

## OPINION

**BUSTAMANTE, Judge.**

**{1}**     As a matter of first impression we are asked to decide whether termination of parental rights ends a parent's obligation to make child support payments imposed in a divorce decree. We conclude that a termination of parental rights severs the parent-child relationship completely—including the support obligation. As a result we reverse the district

1

court's order.[1]

## I.    BACKGROUND

**{2}**    Maria Magdalena Aeda (Mother) and Osamah Aeda (Father) were married in 1984 and divorced in 1990.  They had two children during the marriage.  The divorce decree ordered Father to pay $600 per month in child support until the children reached majority, were emancipated, or until further order of the court.

**{3}**    In March 1993, Mother filed for termination of Father's parental rights, alleging failure to pay child support and physical and mental abuse of her and the children.  Father did not respond to Mother's motion on its merits.  Rather, he filed a special appearance challenging jurisdiction.  Father did nothing in the case after filing his special appearance, failing even to appear at the hearing he requested on the issue.

**{4}**    The district court held a hearing on the motion accepting oral testimony and exhibits. In its order terminating Father's parental rights, the district court found that "the children . . . have been abandoned as [Father had] paid no child support since entry of the [divorce decree]" and that "[t]he children . . . have witnessed horrific violence and mayhem to those they love; specifically, their mother and maternal grandmother, which violence was a result of [F]ather's conduct."  The district court also found that Father had kidnapped the children for ten months in 1990, taking them to Texas and not permitting them any contact with Mother during that time.  Specifically with regard to the children, the district court determined:

> 5.    There will be no damage to the children if they never have contact with [F]ather again.  In fact, the children will be relieved.
>
> . . . .
>
> 12.    [T]here has been extensive emotional and physical abuse of the minor children and it is in the best interest of these children that the parental rights of [F]ather be terminated forever.

The termination order of November 1, 1993, made no mention of alteration of the child support order.  Notably, neither Mother's motion nor the district court's order cited any statutory authority.

---

[1]Given that the events giving rise to this case occurred twenty years ago, however, we limit the force of our ruling to the statutory provisions in effect in March 1993—the date the petition to terminate Father's parental rights was filed.

**{5}** In 1991, Mother applied for assistance from the New Mexico Human Services Department, Child Support Enforcement Division (HSD), which prompted collection efforts by HSD against Father. Using a variety of mechanisms, HSD seized approximately $7620 from Father between 1991 and 2005. In 2004, Father contested the seizure of funds from his bank account in an administrative hearing, arguing that New Mexico did not have jurisdiction over his divorce proceedings. The hearing officer in that proceeding determined that New Mexico had jurisdiction, HSD had acted properly in seizing the funds, and Father owed over $42,000 in child support at that time. There is no indication in the record that Father ever raised termination of his rights as a defense to HSD's collection efforts.

**{6}** In October 2008, HSD moved to intervene in the proceedings between Mother and Father (the divorce and termination proceedings were assigned the same case number) and filed a motion to establish a payment plan for child support arrearages. Now represented by counsel, Father moved to dismiss HSD's motion arguing that "[b]y terminating his parental rights, the [termination o]rder terminated [Father's] parental relationship with the children such that [Father] thereafter owed no legal duty or obligation to the children, including any duty to support the children." Father also asserted laches as an affirmative defense. In June 2009, after Father responded, Mother, through private counsel, filed her own motion to show cause through which she sought payment of child support arrearages under the divorce decree.

**{7}** The district court held a hearing on Father's and Mother's motions in August 2009. At the conclusion of the hearing the district court ruled against Father because in its view parental rights and the duty to support are "separate and distinguishable." The record does not include an order reflecting this ruling until entry in February 2011 of the final order that is the subject of this appeal.

**{8}** After the district court's oral denial of Father's motion to dismiss, HSD withdrew as intervenor and "permanently" waived its assignment of rights and financial interests.

**{9}** In June 2010 the district court determined after a hearing that the defense of laches did not apply to this case. And, after a final hearing, the district court ordered Father to pay past due child support, plus interest, in the stipulated amount of $117,502.41, covering the fourteen-year period from October 1994 through September 30, 2010. Father appealed.

## II.     DISCUSSION

**{10}** Father first argues that the district court misconstrued the applicable statutes in ruling that termination of his parental rights did not terminate his child support obligations. He also argues that the district court erred in finding that the defense of laches was inapplicable. Given our conclusion that termination of parental rights does terminate child support obligations, there is no need to address laches.

### 1.     Standard of Review

**{11}** Interpretation of a statute is a question of law, which an appellate court reviews de novo. *See Morgan Keegan Mortg. Co. v. Candelaria*, 1998-NMCA-008, ¶ 5, 124 N.M. 405, 951 P.2d 1066. The overriding purpose of statutory construction is to "give effect to the Legislature's intent." *Key v. Chrysler Motors Corp.*, 121 N.M. 764, 768, 918 P.2d 350, 354 (1996). "In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background." *Id.* at 768-69, 918 P.2d at 354-55. If we determine that the language of a statute is clear and unambiguous, there is no need for additional analysis of the statute. *Sims v. Sims*, 1996-NMSC-078, ¶ 17, 122 N.M. 618, 930 P.2d 153. Rather, "it is . . . the responsibility of the judiciary to apply the statute as written." *Martinez v. Cornejo*, 2009-NMCA-011, ¶ 11, 146 N.M. 223, 208 P.3d 443 (internal quotation marks and citation omitted); *see State ex rel. Barela v. N.M. State Bd. of Educ.*, 80 N.M. 220, 222, 453 P.2d 583, 585 (1969) ("We are not permitted to read into a statute language which is not there, particularly if it makes sense as written."). When the statute's language is not clear and unambiguous, we rely on the history of the statute, *Key*, 121 N.M. 768-69, 918 P.2d at 354-55, construction of "other statutes concerning the same subject matter," *Quantum Corp. v. State Taxation & Revenue Department*, 1998-NMCA-050, ¶ 8, 125 N.M. 49, 956 P.2d 848, and the principles embodied in the Uniform Statute and Rule Construction Act, NMSA 1978, Sections 12-2A-1 to -20 (1997). Unless a statute violates the Constitution, "[w]e will not question the wisdom, policy, or justness of legislation enacted by our Legislature." *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 10, 122 N.M. 524, 928 P.2d 250. Finally, we note that "[l]egislative silence is at best a tenuous guide to determining legislative intent[.]" *Swink v. Fingado*, 115 N.M. 275, 283, 850 P.2d 978, 986 (1993).

## 2. Which Statute Requires Construction

**{12}** Our first task is to determine which statute requires construction. Mother filed the petition for termination of Father's rights in March 1993 and the district court granted the petition in November 1993. Between those two dates, the Legislature passed amendments to the Children's Code, which became effective on July 1, 1993. 1993 N.M. Laws, ch. 77, §§ 234, 236. Thus, our review is focused on the construction of the Children's Code as it existed before those amendments were effective, not on the language of the Children's Code after the amendments. *See* § 12-2A-16(A), (B) ("A pending civil action or proceeding may be completed and a right accrued may be enforced as if the statute or rule had not been amended or repealed.").

**{13}** Having determined the temporal focus of our inquiry, we must next determine which statute was operative in this case. Neither Mother's petition for termination of Father's rights nor the district court's order cited a statutory basis for the termination. We conclude that the petition and order were based on the authority granted in NMSA 1978, Sections 32-1-54 and -55 (1985) primarily because there were no other provisions for termination of parental rights extant at the time. In addition, Section 32-1-55 and other sections of the Children's Code were cited by Mother in subsequent pleadings, and the district court found "[t]hat there ha[d] been extensive emotional and physical abuse of the . . . children and it is

4

in the best interest of these children that the parental rights of [Father] be terminated forever[,]" which are some of the required elements of termination under Sections 32-1-54 and -55. *See* § 32-1-54 (A), (B)(3). Our focus here, then, is on construction of Sections 32-1-54 and -55.

**3.      Sections 32-1-54 and -55 Are Not Clear and Unambiguous**

**{14}**      We next examine Sections 32-1-54 and -55 to determine if they are clear and unambiguous. The provision describing the effect of an order of termination reads:

> A judgment of the court terminating parental rights divests the parent of all legal rights and privileges, and dispenses with both the necessity for the consent to or receipt of notice of any subsequent adoption proceeding concerning the child. A child's inheritance rights from and through its biological parents are terminated only by a subsequent adoption.

Section 32-1-55(J). Section 32-1-55 generally describes the process to be followed by the district court when considering a petition to terminate parental rights. The companion provision—Section 32-1-54—generally provides the substantive grounds upon which parental rights may be terminated. Section 32-1-54(E) adopts by reference the definition of "parental rights" found in the Adoption Act. *See* NMSA 1978, § 40-7-30(K) (1985, as amended through 1989). That definition states: "'parental rights' means all rights of a parent with reference to a minor, including parental right to control, to withhold consent to an adoption[,] or to receive notice of a hearing on a petition for adoption[.]"). *Id.*

**{15}**      Mother notes that this language "only speaks in terms of the rights of the parent." Mother contends that because the statutes' terms address only a parent's rights to his or her child, rather than a parent's duties toward the child, a child's inherent right to support from the parent persists after termination of the parent's rights. Mother's argument relies on the premise, well established in New Mexico law, that a child is entitled to support from his or her parents. *See Mintz v. Zoernig*, 2008-NMCA-162, ¶ 15, 145 N.M. 362, 198 P.3d 861 ("It is well established that a natural father is required to support his children."); *In re Estate of DeLara*, 2002-NMCA-004, ¶ 10, 131 N.M. 430, 38 P.3d 198 ("Our Supreme Court has characterized child support as a parent's most important single obligation." (internal quotation marks and citation omitted)); *Tedford v. Gregory*, 1998-NMCA-067, ¶ 24, 125 N.M. 206, 959 P.2d 540 ("In New Mexico, . . . children are entitled to support from their parents.").

**{16}**      If this were the only sentence at issue, Mother's argument would be persuasive. The second sentence of Section 32-1-55(J), however, reserves to a child specific inheritance rights. Father argues that the Legislature's explicit preservation of a child's right to inherit indicates that other rights were not preserved after termination. He argues, "If the Legislature had also intended to impose a duty of continuing child support on parents whose parental rights were terminated . . . then logically it would have done so by . . . stat[ing] that

5

children retained child support rights as well as rights of inheritance." He appears to invoke "the old rule of statutory construction *inclusio unius est exclusio alterius*; the inclusion of one thing is the exclusion of another." *State ex rel. State Eng'r v. Lewis*, 1996-NMCA-019, ¶ 11, 121 N.M. 323, 326, 910 P.2d 957, 960. Like Mother's argument, Father's argument for interpretation of the second sentence of Section 32-1-55(J) would be more persuasive if the sentence stood alone, but it does not. While we might infer from the explicit preservation of inheritance rights that other rights are not preserved, by the same token we also might infer from the absence of reference to a parent's obligations that termination of parental rights extinguishes only rights, not obligations. Given no clear basis for the choice, we conclude that Section 32-1-55(J) does not by itself answer the question posed by this case. Thus, we turn to other principles of construction.

## 4. History of the Children's Codes and Sections 32-1-54 and -55

{17} We turn first to the history of Sections 32-1-54 and -55. That history not surprisingly reflects an evolution of attitudes toward the parent-child relationship and the problems posed by abused, neglected, and delinquent children. Until relatively recently, provisions for the removal of children from unfit parents were grouped with statutes governing adoption. *See State ex rel. Children, Youth & Families Dep't v. B.J.*, 1997-NMCA-021, ¶ 7, 123 N.M. 99, 934 P.2d 293; *see also* Theodore E. Lauer, *The New Mexico Children's Code: Some Remaining Problems*, 10 N.M. L. Rev. 341, 342 nn.4 & 5 (1980) (discussing pre-1917 history of such codes). Pre-statehood laws addressing parental rights were included in a chapter titled "Adopting and Legitimizing" and permitted courts "to remove children from the custody of prostitutes or inhabitants of a house of ill fame and to grant custody to another proper person, association, or corporation" and "to permit adoption of children who had been abandoned and were not provided for by parents or relatives." *B.J.*, 1997-NMCA-021, ¶ 7; *see* 1897 Compiled Laws of New Mexico §§ 1503 & 1504, C.L. 1897. That chapter also provided that "[t]he parents and relatives of an adopted child are, from the time of its adoption, relieved of all parental duties toward and all responsibility for the child so adopted, and shall have no right to or control over it." 1897 Compiled Laws of New Mexico § 1508, C.L. 1897.

{18} In 1917, a "more extensive statutory structure" was enacted that became the root of today's Children's Code. *B.J.*, 1997-NMCA-021, ¶ 8; Lauer, *supra*, at 342. The 1917 statute focussed on "delinquent and neglected children" and "empowered the district courts to adjudge as wards of the court and to place under the guardianship of individuals or associations" neglected or abused children. Lauer, *supra*, at 342-343. Until 1972, although separate statutes existed governing adoptions, the "dependent and neglected children" statutes also included provisions for adoption of a neglected child and procedures for parents to challenge adoptions. *See, e.g.*, NMSA 1941, §§ 25-201 to -218 (1893, as amended through 1933); NMSA 1941, §§ 25-219, -223, -228 (1951) (Vol. 2, 1951 Cum. Pocket Supp.); -224 (1953) (Vol. 2, 1953 Pocket Supp.); NMSA 1953, §§ 22-2-20 to -35 (1971, as amended through 1975) (Vol. 5, 1975 Pocket Supp.); NMSA 1953, §§ 13-9-6 (1951); -6.1 (1961) (Vol. 3, 1967 Pocket Supp.) ("Freeing children for adoption—Procedure—Parental

6

rights protected"). Thus, there appears to have been some overlap between the two types of statutes. These early provisions relating to abused or neglected children remained largely unchanged from 1917 until 1972. Lauer, *supra*, at 343; *B.J.*, 1997-NMCA-021, ¶ 5; *see* NMSA 1941, §§ 44-202 (1917); -206 (1951) (Vol. 3, 1951 Cum. Pocket Supp.); NMSA 1953, §§ 13-9-2 (1917); -6 (1951).

**{19}** In 1972, the Children's Code was enacted and the previous provisions were repealed. 1972 N.M. Laws, ch. 97, §§ 1 to 45. The Children's Code was based in large part on the "Legislative Guide for Drafting Family and Juvenile Court Acts" published by the Children's Bureau of the Social and Rehabilitation Service of the United States Department of Health, Education, and Welfare. Lauer, *supra*, at 344. The Children's Code was motivated partially by the United States Supreme Court's decision in *In re Gault*, 387 U.S. 1 (1967), in which the Court "extended to juveniles the right to notice of charges, to counsel, to confrontation and to cross-examination of witnesses, and to the privilege against self-incrimination." *State v. Rudy B.*, 2010-NMSC-045, ¶ 55, 149 N.M. 22, 243 P.3d 726; *see* Lauer, *supra*, at 343-44. Consequently, its focus was primarily on "strengthen[ing] the rights of children in the juvenile court [and] advanced thinking in terms of children's rights and procedural safeguards." Lauer, *supra*, at 344. The 1972 version of the Children's Code did not contain a provision specifically addressing termination of parental rights. It did include a definition of "parent" and provided for placement of children when their parents' rights had been terminated. *See* NMSA 1953, § 13-14-3(F) (1973) (stating that a "parent" is one whose rights have not been terminated); NMSA 1953, § 13-14-25(H) (Vol. 3, 1975 Pocket Supp.) (specifying who may be a guardian of a child when parental rights have been terminated).

**{20}** Meanwhile, in 1971, a new Adoption Act was enacted. 1971 N.M. Laws, ch. 222. The new statute included a provision for termination of parental rights when a child had been abandoned or "the parent . . . has repeatedly or continually neglected . . . the natural and legal obligations of care and support[.]" NMSA 1953, § 22-2-23(3) (1971) (Vol. 5, 1975 Pocket Supp.); 1983 N.M. Laws, ch. 239, § 2. The 1971 Adoption Act defined "parental rights" as "all rights of a parent with reference to a minor, including parental right to control, or to withhold consent to an adoption, or to receive notice of a hearing on a petition for adoption[.]" Section 22-2-21(I) (1971) (Vol. 5, 1975 Pocket Supp.).

**{21}** And, for the first time in New Mexico's statutes, the 1971 Adoption Act provided a description of the effect of an order terminating parental rights. Section 3(E) of the Adoption Act provided:

> E. The court after hearing may grant or deny a judgment terminating parental rights. A judgment of the court terminating parental rights has the same effect as an adoption judgment has in terminating the parent-child relationship, including terminating parental rights, dispensing with the consent, and with any required notice of an adoption proceeding of a parent whose relationship is terminated by the judgment.

7

1971 N.M. Laws, ch. 222, at 754. This language was codified at Section 22-2-23(E).

**{22}** In 1975 the Legislature amended Section 22-2-23. 1975 N.M. Laws, ch. 185. Relevant to our inquiry, the Legislature repealed Subsection (E) and replaced it with two new provisions:

> F. The court after hearing may grant or deny a judgment terminating parental rights. If the attempted termination is based on the unfitness of the parent, that unfitness must be proved by clear and convincing evidence. The court's judgment shall recite the findings upon which it is based; if the court terminates parental rights, it shall also appoint a custodian for the minor and shall fix responsibility for the minor's support.

> G. A judgment of the court terminating parental rights divests the parent *and the child* of all legal rights, privileges, *duties and obligations*, including rights of inheritance, with respect to *each other*, and dispenses with both the consent of, and the requirement of notice to, that parent whose relationship is terminated by the judgment for a subsequent adoption proceeding.

Section 22-2-23(F), (G) (Vol. 5, 1975 Pocket Supp.) (emphasis added). This section was recompiled into NMSA 1978 as Section 40-7-4. Parallel Tables. Although Section 40-7-4 was amended several times, the language on the effect of termination of parental rights remained constant until 1985. 1983 N.M. Laws, ch. 239, § 2. It is clear that the 1971 and 1975 termination provisions contemplate complete extinguishment of the parent-child relationship, including a parent's support obligation.

**{23}** In 1985, as part of yet another significant revision to the Adoption Act, the provisions for termination of parental rights were essentially moved from the Adoption Act to the Children's Code when Section 40-7-4 was repealed and Sections 32-1-54 and -55 were adopted instead.[2] 1985 N.M. Laws, ch. 194, §§ 36, 37, 39. Sections 32-1-54 and -55 incorporated Section 40-7-4's provisions permitting termination when a child has been abandoned, abused, or neglected and most of the procedural requirements found in Section 40-7-4. *See* § 32-1-54(B)(1), (3); § 32-1-55(A), (B), (I), (J). Section 32-1-54(E) also provided that "[t]he definitions contained in Section 2 of the Adoption Act [40-7-30 NMSA

---

[2]NMSA 1953, Sections 13-14-1 to -45 (1972, as amended through 1973), the original Children's Code, were recompiled into NMSA 1978, Sections 32-1-1 to -48 (1972, as amended through 1989). Parallel Tables. Additional sections were added to the Children's Code in 1979 and 1981 such that the Code encompassed Sections 32-1-1 to -53, and a 1993 recompilation resulted in the Children's Code encompassing all of Section 32A, including modified versions of Sections 32-1-54 and -55. We understand Sections 32-1-54 and -55 to be part of the Children's Code at the times relevant to this case.

1978] shall apply to the termination of parental rights under this section and Section 32-1-55." (Alteration in original.) The only definition that is relevant to our inquiry is that of "parental rights" found at Section 40-7-30(K), and it is the same definition found in the 1971 version of the Adoption Act (" '[P]arental rights' means all rights of a parent with reference to a minor, including parental right to control, to withhold consent to an adoption[,] or to receive notice of a hearing on a petition for adoption[.]").

**{24}** Most important to our purposes are the amendments to the language regarding the effect of termination of parental rights. That language was amended to remove reference to a parent's "duties and obligations" to a child, as well as to a child's rights, duties, privileges and obligations with respect to a parent. Section 32-1-55(J). It was also amended to preserve a child's right to inherit from the terminated parent. *Id.* Thus, the 1985 amendment resulted in the language that is at the heart of this case.

**{25}** The question is whether the changes in language from 1975 to 1985 reveal a legislative intent to continue support obligations after termination of parental rights. We conclude that they do not. We start by considering the reason for the termination provisions. The overall purposes of the Children's Code are to promote the best interests of the children involved and to promote the unity of the family whenever possible. *See* § 32-1-54(A); NMSA 1978, § 32-1-2(A) (1972). The unfortunate but inescapable fact, however, is that at times these two goals are irreconcilable. Given the findings entered by the district court in its order terminating Father's rights here, it appears this was one of those times. When that occurs termination of parental rights is required. *See In re Adoption of J.J.B.*, 119 N.M. 638, 652, 894 P.2d 994, 1008 (1995). The 1971 and 1975 versions of the provisions on the effect of termination clearly describe a complete severance of the parent-child relationship. *See* 1971 N.M. Laws, ch. 222 at 754 (discussing Section 22-2-23(E) (1971)); § 22-2-23(F), (G) (1975) (Vol. 5, 1975 Pocket Supp.). They reflect that the function of termination is to separate as completely as possible the child from a dysfunctional parent—all in the child's best interest. *See In re Adoption of Doe*, 101 N.M. 34, 37, 677 P.2d 1070, 1073 (Ct. App. 1984).

**{26}** Though the language used in 1985 is simpler, we perceive no intent by the Legislature to change the purpose and function of termination; that is, severance of the parent-child relationship. The one exception, of course, is that the Legislature explicitly preserved the child's right of inheritance. This change does not indicate a legislative intent to preserve ongoing support obligations of the parent. Inheritance rights and child support are simply too different to infer a legislative connection. If anything, the explicit treatment of inheritance rights and silence as to ongoing support implies a legislative intent to not alter the effect of termination on support duties.

**{27}** We also note that the 1985 amendments deleted reference to children's "legal rights, privileges, duties and obligations with respect to parents." If the legislature harbored any intent to thereby alter the effect of severance of the parent-child relationship and retain parental responsibility for financial support, there would be no need to explicitly exclude

9

inheritance rights from the effect of termination. And deleting reference to a child's rights and privileges is quite an odd way to preserve a right to continuing support. The continuation of support obligations after termination—a signal change—would seemingly require definitive action by the Legislature.

**{28}** Father argues that the 1985 amendment was in response to this Court's 1978 holding in *Wasson v. Wasson*, 92 N.M. 162, 164, 584 P.2d 713, 715 (Ct. App. 1978). Father argues that the Legislature eliminated references to a parent's "duties and obligations" from the termination statute because they were "unnecessary" after the *Wasson* Court implicitly accepted that "termination of parental rights includes both parental rights and parental obligations" when it cited "approv[ingly]" to *Anguis v. Superior Court In & For County of Maricopa*, 429 P.2d 702 (Ariz. Ct. App. 1967) and *Roelfs v. Sam P. Wallingford, Inc.*, 486 P.2d 1371 (Kan. 1971). *See Wasson*, 92 N.M. at 164, 584 P.2d at 715. In *Wasson*, the Court relied on the pre-1985 language, which expressly terminated a parent's "duties and obligations" to a child when the parent's rights were terminated, to hold that termination of parental rights of the father was not in the best interests of the child because termination of the father's rights would also terminate the child's right to inherit from the father. *Id.* According to Father, "[t]he Legislature's . . . elimination of [the words] 'duties and obligations' [after *Wasson*] should properly be interpreted as the removal of superfluous language which was unnecessary in view of the judicially accepted recognition" that the rights of parents and children are reciprocal. *See State v. Cleve*, 1999-NMSC-017, ¶ 14, 127 N.M. 240, 980 P.2d 23 (stating the presumption that the Legislature is aware of case law when drafting legislation and "could have expressly taken a different approach" from the court in amendments to a statute if it disagreed with the court's interpretation) (internal quotation marks and citation omitted)).

**{29}** Father simply pushes the Court's mere citation to *Anguis* and *Roelfs* too far. The reference to *Anguis* and *Roelfs* can be seen as the Court's general agreement with the approach evident in those cases to treat parental "rights" and "obligations" as two faces of the same coin. But the *Wasson* holding was based on the explicit language of the statute in place at the time; the Court did not have to "construe" the statute's language at all or rely on foreign cases to reach its ruling. *Wasson*, 91 N.M. at 163-64, 584 P.2d at 714-15. The significance of the Court's reference to *Anguis* and *Roelfs* in *Wasson* is thus ambiguous. Furthermore, *Roelfs* was based on an examination of Kansas statutes, which are different from those here, and is, therefore, of limited use. 486 P.2d at 1374-76. In addition, the *Anguis* court's definition of parental rights "is totally devoid of any use of the rules of statutory construction or any other legal reasoning. It appears that the court simply decided without any basis that the term " 'parental rights' . . . means 'both parental rights and parental obligations.' " *Ex parte M.D.C.*, 39 So. 3d 1117, 1126 (Ala. 2009) (citation omitted). Thus, we do not agree with Father that we can assume the Legislature relied on a seven-year-old case for a "judicially accepted" definition of parental rights in crafting

10

Section 32-1-55(J)[3]. *See Swink*, 115 N.M. at 283, 850 P.2d at 986 ("Legislative silence is at best a tenuous guide to determining legislative intent[.]").

**{30}**    We conclude that the changes in the statute from 1975 to 1985 cannot reasonably be interpreted to preserve ongoing support obligations by parents after termination.

**5.        Related Statutory Provisions**

**{31}**    We next examine related parts of the Children's Code.  Father argues that we can ascertain legislative intent to extinguish a parent's obligation to support a child after termination from the requirement for the district court to "appoint a custodian for the minor . . . and fix responsibility for the minor's support" after parental rights are terminated. Section 32-1-55(I).  He notes that this provision is not specific as to *who* should be responsible for supporting a child after a parent's rights are terminated and contrasts it with the "Parental responsibility" provision, which states that "[t]he court shall order *the parent* to pay the reasonable costs of support and maintenance of the child that the parent is financially able to pay if a child is adjudicated to be neglected, abused or in need of supervision and the court orders the child placed with an agency or individual other than the parent." (emphasis added).  Section 32-1-47(C); *see* § 32-1-41(C) (permitting the court to order the parent to pay a "reasonable sum" for the support of the child if legal custody of the child has been "vested in someone other than the child's parents" and permitting contempt charges if the parent "willfully fails . . . to pay").  Father assumes that Section 32-1-47(C) applies only when parental rights are not terminated and that "[i]f the Legislature had not intended to distinguish between a parent's child support responsibility when the child is placed with a third party *without termination of parental rights* and when a parent's rights are terminated, then it logically would have likewise imposed an express duty [to pay] child support on a parent whose rights have been terminated."

**{32}**    Mother argues to the contrary that Section 32-1-47(C) supports continuation of support obligations after termination.  She argues that Father's distinction between Section 32-1-47(C) and Section 32-1-55(I) is specious because Section 32-1-47(C)'s provision applies even when parental rights are terminated so long as the two stated conditions (adjudication of abuse or neglect and a court-ordered placement other than with the parent) are met, and that its silence as to termination of parental rights means that termination has no effect on responsibilities under the provision.

**{33}**    We do not agree with either interpretation fully, though we conclude that Father is closer to the mark.  We agree that Section 32-1-47(C) applies only to instances in which

---

[3]It is much more likely that the 1985 amendments were prompted by the U.S. Supreme Court opinion in *Santosky v. Kramer*, 455 U.S. 745 (1982), which explicitly recognized a fundamental liberty interest in the right of parents to raise their children.

11

parental rights have not been terminated. By its terms, Section 32-1-47(C) applies to a set of circumstances that are broader than and separate from orders of termination. Placement of a child with a parent is not possible after termination of that parent's rights. *See* § 32-1-3(I) (defining "custodian" as "a person, *other than a parent* or guardian, who exercises physical control, care or custody of the child"). Thus, Section 32-1-47(C) cannot apply when parental rights are terminated because it presumes the possibility that placement with a parent is an option. This interpretation is bolstered by Section 32-1-47(A), which describes a factual scenario—an action against the child personally in which the parents may be joined—which can only occur pre-termination. Further, there is nothing about a finding that a child is in need of supervision or has been neglected or abused that necessarily requires termination. Situations that progress to termination are handled under Sections 32-1-54 and -55. Orders of support entered prior to actual termination bear no relationship to what may be appropriately ordered after termination. In sum, we conclude that Section 32-1-47 addresses a different problem in the course of child adjudications and is not helpful in assessing what Section 32-1-55(J) means with regard to ongoing parental support after termination.

**{34}** The definition of "parental rights" referenced in the termination provisions does not mention parental responsibilities. Section 40-7-30(K). We acknowledge that other parts of the Children's Code explicitly distinguished between rights and responsibilities. For example, the definition of "legal custody" was:

> [A] legal status created by the order of the court . . . that vests in a person or agency the *right* to determine where and with whom a child shall live; the *right and duty* to protect, train and discipline the child and to provide him with food, shelter, education and ordinary and emergency medical care; and the right to consent to his enlistment in the armed forces of the United States, *all subject to . . . any existing parental rights and responsibilities*.

Section 32-1-3(J) (emphasis added).

**{35}** Similarly, a "[p]ermanent guardianship vests in the guardian all *rights and responsibilities of a parent*, subject to the *rights and responsibilities* of the natural or adoptive parent, if any, as set forth in the decree of permanent guardianship." NMSA 1978, § 32-1-58(A) (1987).

**{36}** This review reveals that the Legislature intentionally distinguished between parental rights and parental responsibilities in some provisions. Of course, we "read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." *Key*, 121 N.M. at 769, 918 P.2d at 355. However, these provisions do not provide any help in interpreting legislative intent as to support payments after termination.

**{37}** Sections 32-1-3(J) and 32-1-58(A) address circumstances that can only exist pre-termination. This alone makes them suspect as guides to the meaning and effect of

12

provisions which apply post-termination. In addition, Sections 32-1-3(J) and 32-1-58(A) address the problems inherent to situations in that the control of and responsibility for a child is placed in persons or agencies foreign to the child. There is an obvious need to be more detailed as to the powers and duties vested in a non-parent over a child. In some instances a complicating factor may be that custody—in its broadest sense—may be split between persons and agencies and even parents. When "custody" is split there is even more need for recognition in the controlling statute of the various roles inherent in taking care of a child. But these considerations say nothing about these roles after termination. Termination is meant to eliminate a parent's connection with the child. There is no need for parsing roles thereafter because the parent has none.

**{38}** We conclude that the Legislature had no intent to change the fundamental nature and effect of an order terminating rights when it amended the Children's Code in 1985. The fundamental and terrible act of severing the parent-child relationship cuts off all connection between them except as specifically excepted by the Legislature.

**{39}** Our analysis has relied on our interpretation of New Mexico's statutes as they existed as of March 1993. We have not relied on out-of-state authorities to this point—though they are numerous. Our reluctance to rely on out-of-state cases stems primarily from the fact that the statutory schemes they interpret are different. *See, e.g.*, *Roelfs*, 486 P.2d at 1374-76. The scope of the differences weakens their force as interpretive guides in New Mexico. In addition, some of the cases do not engage in sufficiently independent analysis, choosing instead to cite cases from other states and essentially say "we agree." *See, e.g.*, *Anguis*, 429 P.2d at 705; *In re K.S.*, 515 P.2d 130, 133 (Colo. 1973); *Coffey v. Vasquez*, 350 S.E.2d 396, 397 (S.C. Ct. App. 1986). With those limitations in mind, we do note that the great majority of out-of-state cases agree that almost as a matter of definition termination of parental rights—or more accurately the parent-child relationship—works to end the parental support obligation. An illustrative case is *County of Ventura v. Gonzales*, 106 Cal. Rptr. 2d 461, 464 (Cal. Ct. App. 2001), concluding that an order terminating parental rights completely severs the parent-child relationship and implicitly terminates the parental duty of support. *See also State ex rel. Welfare Div. of Dep't of Human Res. v. Vine*, 662 P.2d 295, 297-98 (Nev. 1983) (holding that support obligations ended with termination of parental rights since termination of parental rights severs the parent-child relationship).

**{40}** We decline to follow cases such as *Ex parte M.D.C.* and *State v. Fritz*, 801 A.2d 679 (R.I. 2002) because we believe they fail to address the function, purpose, and seriousness of a termination of parental rights. Further, their analysis relies unduly on statutory provisions other than their termination section for definitional guidance. As we demonstrate above, other statutory provisions designed to address pre-termination circumstances offer no useful guidance for the post-termination world. Our view and approach to the issue is more in line with the vigorous dissent filed by Justice Murdock in *Ex parte M.D.C.*, 39 So. 3d at 1133-45.

**CONCLUSION**

**{41}** The judgment below is reversed.  The matter is dismissed.

**{42}  IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index for *Aeda v. Aeda*, No. 31,182**

**Appeal and Error**
Standard of Review

**DOMESTIC RELATIONS**
Abandonment
Adoption
Child Support
Domestic Violence
Neglect and Abuse
Termination of Parental Rights

**REMEDIES**
Laches

**STATUTES**
Interpretation
Legislative Intent
Rules of Construction