The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: July 25, 2024

**NO. S-1-SC-39544**

**MAILE SOON,**

Petitioner-Petitioner,

v.

**JEANNINE KAMMANN,**

Respondent-Respondent

**ORIGINAL PROCEEDING ON CERTIORARI**
**Gerard J. Lavelle, District Judge**

Atkinson & Kelsey, P.A.
Thomas C. Montoya
Albuquerque, NM

for Petitioner

ACLU of New Mexico Foundation
Maureen A. Sanders
Elinor J. Rushforth
Albuquerque, NM

for Respondent

**OPINION**

**VIGIL, Justice.**

{1}     We are reminded yet again that the touchstone of a custody adjudication in New Mexico is not genetics, gender, or family composition, but the best interest of the child. This case requires us to determine whether a person's admission to not being a genetic parent of a child is sufficient to rebut a presumption of parentage under the New Mexico Uniform Parentage Act (UPA), NMSA 1978, §§ 40-11A-101 to -903 (2009, as amended through 2021). We conclude that it is not. Instead, we hold that the district court must follow the procedures in the UPA, which establish specific admissibility requirements for the results of genetic testing, including a requirement that the district court consider the best interest of the child before ordering such testing.

{2}     Subsequent to oral argument in this case, we issued an order that Jeannine Kammann is a legal parent to the twin children born to Kammann's spouse, Maile Soon, during their marriage. Herein, we explain our reasoning.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

{3}     Soon and Kammann shared a desire to bring children into their relationship. They first began assisted reproduction treatment prior to marrying, and Soon

conceived by an intrauterine insemination procedure[1] approximately ten months into the marriage. Kammann fully participated in Soon's prenatal medical care.

{4}     The relationship between the two women faltered, and Soon moved out of their shared home during the pregnancy. She subsequently filed for divorce, but the couple remained married when Soon gave birth. After the twins were born, Kammann visited the twins in the hospital and again after they went home, conferred about their names, and paid child support to Soon.

{5}     The custody battle quickly became contentious, and Soon moved to dismiss Kammann's parentage claim for lack of standing. Soon did not dispute that Kammann was presumed to be a parent of the twins under Section 40-11A-204(A) of the UPA because the children were born during the marriage. But Soon argued that Kammann nevertheless lacked standing under the UPA because Kammann is not genetically related to the twins and therefore, pursuant to the UPA, the marriage presumption was rebutted.

---

[1]"Intrauterine insemination" is a form of assisted reproduction, Section 40-11A-102(D)(1), that involves "introducing sperm into the female reproductive organs by means other than sexual intercourse." Theresa Glennon, *Choosing One: Resolving the Epidemic of Multiples in Assisted Reproduction*, 55 Vill. L. Rev. 147, 154 (2010).

{6} Kammann argued, in relevant part, that it is undisputed that the twins were born during the marriage and that this fact establishes her standing as a presumed parent under the UPA and case law.

{7} After a hearing and additional briefing, the district court ruled in Soon's favor. At the hearing, Kammann conceded to not being a genetic or biological parent of the twins. The district court accepted that concession, concluding that Kammann is not the genetic or biological parent of the twins and that the marriage-based presumption of parentage was rebutted.

{8} Kammann appealed to the Court of Appeals. *Soon v. Kammann*, 2022-NMCA-066, 521 P.3d 110. She argued in relevant part that the district court was wrong to conclude on the basis of her statements that she was not genetically related to the twins and regarded her courtroom statements as responses constrained to follow statutory procedure. *Id.* ¶ 10. The Court of Appeals agreed and reversed the

3

district court's conclusion that Kammann's statements rebutted the presumption of marriage. *Id.* ¶ 23.[2]

{9}     Soon appealed to this Court, and we granted certiorari on all questions presented. We held oral argument and ruled that Kammann is a legal parent of the twins. We explain that ruling next, addressing only the issues relevant to our decision and without passing judgment on any issue we do not discuss.

## II.     DISCUSSION

{10}     Soon argues that the Court of Appeals incorrectly concluded that the UPA requires genetic testing to overcome the marriage presumption of parentage. Instead, Soon argues, it was sufficient that Kammann testified that she was not the genetic or biological mother of the twins. She also argues that, in any event, Kammann's

---

[2]The Court of Appeals also held that the district court misconstrued UPA provisions providing that parentage can be established if a person consents to assisted reproduction by a woman in a record signed by both "before the placement of the eggs, sperm or embryos." Section 40-11A-704(A); *see also Soon*, 2022-NMCA-066, ¶¶ 25, 30. The district court concluded "that the signed consent must relate to the *specific procedure* that resulted in pregnancy and the eventual birth of the children." *Id.* ¶ 26 (emphasis added). The Court of Appeals disagreed, holding that the district court must examine whether the "written evidence establishes Kammann's consent to assisted reproduction." *Id.* ¶ 31. Soon questioned this ruling, and we granted certiorari on the question presented. However, because we conclude on other grounds that Kammann is a legal parent to the twins, we do not discuss this issue any further.

argument on this point was not preserved in the district court. As stated herein previously, we disagree with Soon and affirm the Court of Appeals on both issues.

**A.    Standard of Review**

{11}    "Statutory interpretation is an issue of law, which we review de novo." *Chatterjee v. King*, 2012-NMSC-019, ¶ 11, 280 P.3d 283 (citation omitted). "When reviewing a statute, our courts aim to effectuate the Legislature's intent in passing the statute." *Id.* To discern the intent of the Legislature, we look first to the plain language of the statute. *Id.* When we examine statutory language, we give the words their ordinary meaning unless we determine that a different meaning was intended by the Legislature. *Id.*

{12}    "In addition to looking at the statute's plain language, we will consider its history and background and how the specific statute fits in the broader statutory scheme." *Id.* ¶ 12. "Because we consider statutes in the context of the broader act in which they are situated, we read them in conjunction with statutes addressing the same subject matter, ensuring a harmonious, common-sense reading." *Id.*

**B.    The Issue of Whether the Marital Presumption Was Rebutted Was Preserved**

{13}    Soon argues that Kammann did not preserve the "argument" in the district court that genetic testing was statutorily required to rebut the marriage presumption. But our rules do not require the preservation of arguments, only issues. *See* Rule 12-

5

321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked."). The issue of whether the marriage presumption was overcome is central to this case. It was argued in the district court and was, therefore, preserved.

**C.     Kammann's Admission Under Oath That She Is Not a Genetic or Biological Mother of the Twins Is Not Sufficient to Rebut Her Presumption of Parentage**

{14}     Soon does not challenge whether Kammann is the presumed parent of the twins. Indeed, as Soon's spouse at the time of the birth, Kammann is entitled to the marriage presumption and is therefore a presumed parent of the twins. When a child is born during a marriage, as here, the UPA provides a "presumption of paternity" of the spouse if "he and the mother of the child are married to each other and the child is born during the marriage." Section 40-11A-204(A)(1), (B). Despite this problematically gendered statutory language, Kammann's gender is irrelevant and is not disqualifying. For several reasons, we construe these statutes expansively to mean that a presumption of parentage, rather than a presumption of paternity, arises when a child is born during a marriage.

{15}     First, the UPA itself invites that interpretation: Section 40-11A-106 states that UPA provisions "relating to determination of paternity apply to determinations of maternity insofar as possible." Second, this Court has already taken a broad, gender-

6

neutral approach to parentage when construing a related UPA provision. *See Chatterjee*, 2012-NMSC-019, ¶¶ 5, 48 (concluding under a prior version of the UPA that a woman can bring a custody action by relying on a provision providing for a presumption of "paternity" based on holding out a child as the woman's own). Third, a contrary result would seem to be in tension, at the very least, with *Griego v. Oliver*, which held that "all rights, protections, and responsibilities that result from the marital relationship shall apply equally to both same-gender and opposite-gender married couples." 2014-NMSC-003, ¶ 69, 316 P.3d 865; *see also Debbie L. v. Galadriel R.*, 2009-NMCA-007, ¶¶ 14-16, 145 N.M. 500, 201 P.3d 169 (underscoring that protecting the child's welfare and maintaining established bonds with psychological parents are critical conditions in custody determinations). Therefore, we construe Section 40-11A-204(A)(1) and (B) broadly and neutrally with respect to gender.[3]

{16}     We turn to the statutory framework at issue. Under the UPA, the parent-child relationship can be established several different ways. *See* Section 40-11A-201

---

[3]We rely in this opinion on several other sections of the UPA that also use gendered language, often with references to "paternity" or fatherhood. These include Sections 40-11A-201(B)(1), 40-11A-608(A)-(B), (E), 40-11A-621(C). As necessary, and without further explanation, we take a gender-neutral approach to these sections as well.

(describing the ways a parent-child relationship can be established pursuant to the UPA). One way a parent-child relationship is conclusively established is by an unrebutted presumption of parentage, such as the presumption afforded Kammann because the twins were born during her marriage to Soon. Section 40-11A-201(B)(1) (referencing Section 40-11A-204, which establishes the unrebutted assumption of parentage for a person married to the mother when the child is born). This presumption of parentage can be rebutted *only* pursuant to the adjudication procedures established in UPA Article 6. Section 40-11A-204(B).

{17} In Article 6, the UPA provides that presumed parentage can be disproved by the results of genetic testing, § 40-11A-631(D), but "only by admissible results of genetic testing," § 40-11A-631(A). The UPA explicitly defines the admissibility of genetic testing in this context: genetic testing is not admissible "to adjudicate parentage" unless the genetic testing is performed "(1) with the consent of both the mother and the presumed, acknowledged or adjudicated [parent]; or (2) pursuant to an order of the district court." Section 40-11A-621(C).

{18} In this case, there was no mutual consent to genetic testing and no district court order to conduct genetic tests, and neither party offered genetic test results. The presumption of parenthood afforded Kammann under Section 40-11A-204(A)(1) was thus unrebutted. Nevertheless, Soon argues that Kammann's

8

presumption of parentage *was* rebutted because Kammann admitted that she is not a genetic or biological parent of the twins. (emphasis added) Moreover, given the uncontroverted facts of the twins' conception, genetic parenthood seems impossible.

{19} As stated, we reject Soon's argument. Soon has not pointed to anything in the UPA to indicate that the specific admissibility requirements established by the Legislature for genetic testing are optional, and we perceive none. It would controvert the intent of the Legislature to allow the presumption of parentage to be overcome on the basis of an alternative, ad hoc, procedure.

{20} Furthermore, and importantly, although genetic testing can provide a basis to rebut the presumption of parenthood afforded married partners under Section 40-11A-631, the absence of a genetic relationship is not necessarily dispositive. Stated otherwise, the lack of a genetic relationship between the presumed parent and the child or children as an existential matter does not conclusively rebut a presumption of parentage. Instead, the UPA provides that even if the presumed parent is not a genetic parent of the child, the marriage presumption can lead to an adjudication of parenthood. Under the UPA, parentage is viewed through the lens of the best interest of the child, not merely the genetics of the individuals involved in the dispute. Section 40-11A-608(B). We explain.

{21} The Legislature has granted the district court the power to deny a motion for genetic testing. Section 40-11A-608. A motion for genetic testing can be denied if the district court determines that "(1) the conduct of the mother or the presumed or acknowledged [parent] estops that party from denying parentage; and (2) it would be inequitable to disprove the [presumed parent's] relationship [with] the child." Section 40-11A-608(A). Moreover, the Legislature has provided that the district court must consider the best interest of the child when deciding whether to grant or deny a motion for genetic testing. *See* Section 40-11A-608(B) ("In determining whether to deny a motion seeking an order for genetic testing pursuant to this section, the district court *shall consider the best interest of the child*." (emphasis added)).

{22} And to analyze whether a request for genetic testing should be denied on the basis of the best interest of the child, the district court must consider a nonexhaustive

list of nine factors. Section 40-11A-608(B).[4] Two among these factors are particularly noteworthy. First, the district court must be mindful of the effects on equities that might arise from results of testing that disrupts the parent-child relationship, or must consider "the chance of other harm to the child" if genetic testing were ordered. Section 40-11A-608(B)(9). Second, and importantly, the district court must specifically consider the possible harm to the child if the

---

[4]The nine factors are:

(1)     the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;

(2)     the length of time during which the presumed or acknowledged father has assumed the role of father of the child;

(3)     the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;

(4)     the nature of the relationship between the child and the presumed or acknowledged father;

(5)     the age of the child;

(6)     the harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

(7)     the nature of the relationship between the child and any alleged father;

(8)     the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child; and

(9)     other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

presumed or acknowledged parenthood is disproved by genetic testing. Section 40-11A-608(B)(6). Thus, the procedure established by the Legislature provides that the best interest of the child determines whether the district court should consider genetic testing when determining parentage.

{23} This is consistent with the overarching policy goals of the UPA to "ensur[e] that a child will be cared for, financially and otherwise, by two parents" and to "address the interest that children have in their own support." *Chatterjee*, 2012-NMSC-019, ¶¶ 32-33; *see also* Julio C. Romero*, A Gender-Neutral Reading of New Mexico's Uniform Parentage Act: Protecting New Mexican Families Regardless of Sexuality*, 43 N.M. L. Rev. 567, 571 (2013) ("[T]he primary purpose of determining parentage under the UPA is to provide support for the child."). In furtherance of these goals, our appellate courts interpret the UPA to effectuate a broad definition of "parent" in recognition that family structures have evolved in New Mexico. *See Chatterjee*, 2012-NMSC-019, ¶ 34 ("The law needs to address traditional expectations in light of current realities to keep up with the changing demographic of American families and to protect the children born into them."). As in this case, we have found occasion to reject constraints imposed by gender, biology, and family structure that might undermine the UPA's primary purpose of ensuring that children have parents who care for and support them.

{24} In *Chatterjee*, for example, we concluded that a broad, gender-neutral definition of parentage served the best interest of the child, holding that a woman asserting parentage could rely on a UPA presumption of paternity that was seemingly afforded (on the plain language of the statute) to a man that holds out a child as his own. 2012-NMSC-019, ¶¶ 9, 18, 20, 48. We noted that the presumption arose not from biology, but from a person's conduct, and that a narrow focus on biology can come at the expense of the best interest of the child. *Id.* ¶¶ 15, 46.

{25} In *Mintz v. Zoernig*, our Court of Appeals concluded that a sperm donor who assumes a parental role must provide child support, even where there was a preconception agreement that he had no obligation to support the child financially. 2008-NMCA-162, ¶ 1, 145 N.M. 362, 198 P.3d 861. Applying the holding out provision under the UPA, the *Mintz* Court concluded that the agreement made by the father to assume a parental role—which he did—without financial responsibilities was unenforceable because the agreement ran afoul of the strong public policy goal favoring parental support of their children. *Id.* ¶¶ 3, 10-11, 14-15.

{26} The best interest of the child test reverberates throughout New Mexico law relating to children, not merely under the UPA. Indeed, our Legislature consistently emphasizes the importance of the best interest of the child in legal determinations affecting children. *See, e.g.*, NMSA 1978, § 40-4-9(A) (1977) (requiring a district

court to "determine [child] custody in accordance with the best interests of the child" if the minor is under the age of 14 and prescribing a multifactor test); NMSA 1978, § 40-12-2 (1987) (stating that "[t]he purpose of the Domestic Relations Mediation Act is to assist the court . . . in determining the best interests of the children involved in domestic relations cases"); NMSA 1978, § 32A-1-3(A) (2009) (stating that the legislative purpose of the Children's Code is "first to provide for the care, protection and wholesome mental and physical development of children" with the "child's health and safety" being "the paramount concern"); NMSA 1978, § 40-10B-10(C) (2001) (requiring a guardian ad litem to "report to the court concerning the best interests of the child"); NMSA 1978, § 32A-1-4(F) (2023) (defining "court-appointed special advocate[s]" who "assist the court in determining the best interests of the child by investigating the case and submitting a report to the court").

{27} In this case, like *Chatterjee* and *Mintz*, the outcome is driven by the requirement that courts must consider the interests of the child, regardless of the circumstances of conception or familial permutation. Because the UPA and this Court prioritize a child's interest in being "cared for . . . by two parents" and because of "the interest that children have in their own support," *Chatterjee*, 2012-NMSC-019, ¶¶ 32-33, we resist rigid constraints of biology, gender, and family structure when analyzing parentage issues. *See Vest v. State ex rel. N.M. Hum. Servs. Dep't,*

14

1993-NMCA-144, ¶ 19, 116 N.M. 708, 866 P.2d 1175 ("We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development." (internal quotation marks and citation omitted)). The district court, by circumventing the procedure established in the UPA with regard to genetic testing, impermissibly failed to consider the best interest of the child.

## III. CONCLUSION

{28} For the reasons stated, we hold that Kammann's marriage presumption of parentage, which is viewed through the lens of the best interest of the child, is unrebutted as established in the UPA. Additionally, no genetic test results were admitted pursuant to the required procedures established in the UPA. Accordingly, Kammann is a parent of the twin children.

{29}    **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**NANCY J. FRANCHINI, Judge**
**Sitting by designation**

_____

**CINDY. M. MERCER, Judge**
**Sitting by designation**